PACIFIC MUTUAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1115-65. Filed April 28, 1967.

*Richard N. Mackay* and *A. Calder Mackay*, for the petitioner.
*James A. Thomas* and *Marion Malone*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows:

| Year | Amount |
| --- | --- |
| 1958 | $149, 679. 43 |
| 1959 | 54, 882. 51 |
| 1960 | 55, 324. 93 |
| 1961 | 58, 772. 85 |

The issues for determination are as follows:

(1) Whether petitioner may retroactively adjust its beginning 1958 group accident and health claim reserves and individual hospital and medical claim reserves for alleged overstatements therein.

(2) Whether the construction fees received by petitioner during the years 1958 through 1961 were reportable as gain from operations pursuant to section 809(c)(3) of the Internal Revenue Code of 1954[1] or as investment income pursuant to section 804(b) of the Code.

(3) Whether the option fee, standby fees, and bond commitment fees received by petitioner during the years 1959 through 1961 were reportable as gain from operations pursuant to section 809(c)(3) or as investment income pursuant to section 804(b).

(4) Whether the gain from the sale of short-term U.S. Treasury bills received by petitioner during 1961 was reportable as gain from operations pursuant to section 809(c)(3) or as investment income pursuant to section 804(b).

(5) Whether amounts left on deposit with petitioner under settlement option provisions, as well as premiums received by petitioner on certain guaranteed renewable accident and health policies, constitute "premiums * * * attributable to nonparticipating contracts * * * issued or renewed for periods of 5 years or more," as required by section 809(d)(5) of the Code.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Additional issues raised by the pleadings have been disposed of by agreement of the parties.

GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, a corporation duly organized and existing under the laws of the State of California, is a mutual life insurance company transacting the business of life insurance, annuities, and health and accident insurance. Its principal office is at Los Angeles, Calif. Petitioner is authorized to transact business in all States, except New York, and in the District of Columbia and Puerto Rico. Its returns for the calendar years 1958 through 1961 were timely filed with the district director of internal revenue at Los Angeles, Calif.

*Issue 1. Adjustment to Accident and Health Claim Reserves*

FINDINGS OF FACT

In accordance with the laws and regulations of the various States in which it operates, petitioner annually prepares and submits to the insurance departments of those States a detailed report of its financial status. This report is referred to as an annual statement and consists of numerous schedules which reflect various aspects of the company's financial condition as of December 31 of each year. Petitioner relies on much of the information contained in its annual statement when preparing its income tax return.

Petitioner, after obtaining an extension of time, filed its income tax return for the calendar year 1958 in March 1960. On that return, petitioner claimed a deduction for death benefits of $78,168,093.16 in computing its gain from operations. That figure represented the total benefits paid or accrued under section 809(d)(1) of the Code. Of that amount, $31,672,514.42 represented total accident and health benefits paid or accrued during the year, as reflected on Schedule H of petitioner's annual statement for 1958. Also included in the $78 million deduction, and in addition to the $31 million accident and health category, was the amount of $667,448.38 which, like the $31 million category, was intended by petitioner to reflect accident and health benefits paid or accrued during 1958. The $667,000 amount represented the total downward adjustment made by petitioner to certain of its beginning accident and health claim reserves for the calendar year 1958.[2] The result of this adjustment was to reduce certain of petitioner's beginning accident and health claim reserves so that they equaled the

---

[2] These adjustments to 1958 accident and health claim reserves were used by petitioner for the sole purpose of computing its 1958 income tax liability and did not appear on any of the schedules comprising petitioner's annual statement for that year.

"total losses incurred"[3] in 1958 on such claim reserves, as reflected in Schedule O of its annual statement. The adjustment, which was disallowed by respondent, applied to two of the five accident and health claim reserves set forth in Schedule O, namely, the group accident and health claim reserves and the hospital and medical claim reserves.[4] The chart below reflects the adjustment made by petitioner to each of those two categories indicating the reduction to beginning reserves of the several components in each category:

| | Beginning [1] reserves | Adjusted [2] reserves ("total losses incurred") | Amount of downward adjustment |
|---|---|---|---|
| Group accident and health: | | | |
| Disability income | $1,200,000.00 | $1,004,957.52 | $195,042.48 |
| Basic medical expense | 3,350,000.00 | 3,161,654.00 | 188,346.00 |
| Major medical expense | 335,568.00 | 172,479.00 | 163,089.00 |
| Other | 378,372.00 | 344,064.02 | 34,307.98 |
| Total of items adjusted | 5,263,940.00 | 4,683,154.54 | 580,785.46 |
| | [3] 2,616,674.99 | [3] 2,634,407.10 | |
| Total group accident and health | 7,880,614.99 | 7,317,561.64 | |
| Hospital and medical: | | | |
| Comprehensive hospital and medical expense | 112,623.00 | 70,620.00 | 42,003.00 |
| Polio | 80,847.00 | 38,180.00 | 42,667.00 |
| Other | 188,015.00 | 186,022.08 | 1,992.92 |
| Total | 381,485.00 | 294,822.08 | 86,662.92 |
| Total of items adjusted | 5,645,425.00 | 4,977,976.62 | 667,448.38 |

[1] The accident and health claim reserves established at the end of one calendar year are used by petitioner as its beginning reserves for the subsequent calendar year. The reserves here in issue were originally set up as the ending reserves for 1957 and subsequently used as the beginning reserves in 1958.
[2] The figures included under this heading do not represent the amount actually paid since a portion thereof was still unpaid as of Dec. 31, 1958, the liability for which was estimated. (See fn. 3, *supra*.) The amount of that estimated liability for each of the 2 major categories of claims was as follows: group accident and health, $45,512, and hospital and medical, $44,512, constituting a total estimated liability of $90,024.
[3] This amount constitutes a reserve for reinsurance assumed from other companies. In accepting the reserve established by the reinsurance company, petitioner made no adjustment to this amount.

The National Association of Insurance Commissioners prescribes no standards for establishing group accident and health claim reserves. These reserves must be established on a company by company basis, with each insurance company exercising its best actuarial judgment. In establishing beginning reserves for the first two components in its

[3] The "total losses incurred" figures for 1958 were calculated by adding the sum of the payments made during 1958 on losses incurred prior to 1958 to an estimate made by petitioner on Dec. 31, 1958, of its remaining liability for claims incurred prior to 1958. The estimate was arrived at by first determining the 1958 aggregate ending reserve. Then, based on certain tests, petitioner estimated the amount of that reserve which was attributable to claims incurred prior to 1958. Thus, of the two components constituting "total losses incurred," one was an estimate. When petitioner's 1958 income tax return was filed in March 1960, petitioner could have accurately determined the estimated component of its 1958 "total losses incurred" for the several claim categories in question, although it did not do so.
[4] To avoid confusion, it should be pointed out that in its 1958 annual statement petitioner designated as "accident and health claim reserves" those reserves which relate solely to the accident and health insurance aspect of its business. For purposes of identification, petitioner breaks down the accident and health claim area into five categories: Accident only; accident and health; noncancelable accident and health; hospital and medical expense; and group accident and health. The $667,448.38 adjustment in issue relates only to the last two categories.

group accident and health claim category, i.e., "disability income" and "basic medical expense," petitioner ordinarily relied on reserve estimates obtained by the application of three methods of projecting past company experience. Comparison of the beginning 1958 reserve estimates obtained by application of those three methods, as computed on January 30, 1958, with the beginning reserves actually used by petitioner, are set forth below:

| | Method I [1] | | Method II | | Method III | Beginning 1958 reserves used |
|---|---|---|---|---|---|---|
| Disability income | | | $1,077,900 | $1,075,400 | $1,197,000 | $1,200,000 |
| Basic medical expense | | | 3,237,800 | 3,198,100 | 3,321,000 | 3,350,000 |
| Total | $4,473,000 | $4,472,000 | 4,315,700 | 4,273,500 | 4,518,000 | 4,550,000 |
| | 4,539,000 | 4,516,000 | | | | |
| | 4,705,000 | 4,442,000 | | | | |

[1] The 6 estimated reserves obtained by this method included the sum of the reserves for "disability income" and "basic medical expense."

In establishing its "disability income" and "basic medical expense" reserves for 1958, petitioner did not rely exclusively on the results calculated by any one of those three methods. Instead, using the results obtained thereby as a guide only, petitioner determined the beginning reserves by exercising actuarial judgment, taking into consideration circumstances that it thought required establishing greater reserves than were called for by application of most of the projections obtained by those three methods. In establishing its beginning 1958 reserves for the third component in the group accident and health claim category, i.e., "major medical expense," petitioner did not attempt to project reserves from its past experience since it had only entered this field of insurance in 1956 and, as of December 31, 1957, lacked adequate company data from which it could accurately project beginning 1958 reserves. After conversations with other actuaries relative to the size of the reserves needed for this component, which conversations indicated that the reserves should be between 25 and 100 percent of premiums, petitioner's actuary determined that reserves for this component should be 65 percent of premiums paid.

In establishing the beginning 1958 reserves for the two components in its hospital and medical claim category, i.e., "comprehensive hospital and medical expense" and "polio," petitioner estimated the total amount it thought would be payable to policyholders during the entire benefit period, reduced that amount by the total benefits paid as of December 31, 1957, and established the balance as the reserves.

Due to numerous factors occurring subsequent to January 1, 1958, which affected the amount of claims arising from the "group accident

and health" and "hospital and medical" claim categories, the liabilities incurred by petitioner for those two categories, as measured by petitioner's "total losses incurred," were less than the beginning 1958 reserves. For the two reserve categories in question, the following chart shows the percentage excess of total beginning reserves over "total losses incurred" for each of the following years:

| Year | Percentage excess of beginning reserves over "total losses incurred" |
|---|---|
| 1957 | 2. 88 |
| 1958 | 13. 41 |
| 1959 | 1. 14 |
| 1960 | 1. 92 |
| 1961 | (0. 03) |

The beginning 1958 reserves in question were determined by petitioner's actuaries who, at the time they established such reserves, considered them to be reasonable estimates based upon all information available. No mathematical error was made in their computation. All of petitioner's 1958 accident and health claim reserves, including the two categories in question, were certified by an independent actuary to be "satisfactory and adequate."

As reported by the Senate Finance Committee, the bill which became the Life Insurance Company Income Tax Act of 1959 contained a section 811(b)(3) which provided that where an insurance company established a beginning 1958 reserve for "dividends to shareholders" which was larger than the amount of dividends actually paid out during that year, the company could use the actual rather than the erroneously projected amount in computing its taxable income for 1958. During Senate debate on the bill, it was pointed out that a similar problem existed with respect to other beginning 1958 reserves which, if not permitted to be retroactively adjusted so as to accurately reflect actual payments, would cause a misstatement of the taxpayers' income tax liability for 1958.[5] While the legislation was pending in the Senate, the Treasury Department was requested by the chairman of the Senate Finance Committee to render its opinion on a proposed amendment to delete section 811(b)(3) from the bill. In responding to the letter from the Senate Finance Committee, the Treasury Department indicated it had no objection to the adoption of such an amendment. The Life Insurance Company Income Tax Act of 1959, as enacted, did not contain section 811(b)(3) or any other provision which would permit an insurance company to retroactively adjust any beginning 1958 reserves.

---

[5] The uncontradicted testimony of petitioner's vice president and chief actuary indicated that sec. 811(b)(3) resulted from petitioner's lobbying efforts, which, in turn, were prompted by its awareness of possible adverse tax consequences flowing from the method of tax computation imposed by the pending legislation.

124

The issue involved herein, most simply stated, is whether the Life Insurance Company Income Tax Act of 1959 [6] (hereinafter referred to as the 1959 Act) permits petitioner, a mutual life insurance company, to retroactively adjust its beginning 1958 reserves for certain of its claim categories associated with the accident and health aspect of its insurance business. Disposition of this issue, because of the complex statutory provisions involved, requires a discussion of the relevant provisions of the 1959 Act in the context of the facts as found above.

Enactment of the 1959 Act, retroactive to January 1, 1958, constituted the first major change in the method of taxing life insurance companies since 1921. Under the pre-1958 taxing scheme, only net investment income was taxed.[7] With passage of the 1959 Act, there was established a 3-phase taxing formula [8] which, for the first time, included gain from underwriting operations in the computation of taxable income of life insurance companies. The following discussion of the pertinent provisions of the 1959 Act is limited to the tax year in question, 1958, and does not reflect subsequent statutory amendments.

The first phase of the 3-phase taxing scheme is used to determine "taxable investment income," [9] and is obtained by splitting the company's net investment income into "the policyholder's share," which is nontaxable, and "the company's share," which is taxable and constitutes the phase 1 tax base.

Phase 2 is used to determine gain or loss from operations as computed under section 809 and includes gross receipts from all sources less related expenses. Thus, gross receipts include not only the investment income under phase 1 but, in addition, premiums and other receipts. Pursuant to section 809 (d), deductions are allowed against these gross receipts both for the amounts paid as claims and benefits to policyholders and their beneficiaries, and for investment expenses and expenses of operating an insurance business. The deductions also include increases in life insurance and other reserves which the company maintains in order to meet future obligations. When the various deductions are subtracted from gross receipts, the remaining amount constitutes gain (or loss) from operations.

---

[6] Act of June 25, 1959, Pub. L. 86–69, 73 Stat. 112.

[7] Prior to 1958, the income tax imposed on insurance companies was levied only on that portion of investment income which was not needed as reserves to pay present and future claims of policyholders and beneficiaries. S.Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770–771.

[8] Under the provisions of the 1959 Act, only the first two phases were made applicable to the tax year in question, 1958. 1959–2 C.B. 771. As will be discussed, *infra*, the third phase established a tax upon the distribution to "stockholders" of amounts previously exempt from tax. It follows, by definition, that phase 3 does not apply to mutual life insurance companies. 1959–2 C.B. 779.

[9] The method of computing taxable investment income is described in sec. 804. Section numbers of the 1958 amendments to the Code of 1954 and the section numbers under sec. 2 of the Life Insurance Company Income Tax Act of 1959 are identical.

If the section 809 calculation results in a gain from operations, taxable investment income, as computed under phase 1, is subtracted from the gain since taxable investment income is already included in the insurance company's tax base. The amount remaining constitutes underwriting gain since it consists essentially of mortality and loading savings.[10] One-half of the underwriting gain is then added to the taxable investment income obtained under phase 1 to reach the combined tax base under phases 1 and 2.[11] Where, however, there are underwriting losses, i.e., where either the gain from operations is less than taxable investment income or where there is actually a loss from operations, the total tax base under phases 1 and 2 is the gain (or loss) from operations.[12] Expressed differently, the total tax base equals the taxable investment income minus 100 percent of underwriting loss, underwriting loss being equal to the gain (or loss) from operations less taxable investment income.

As indicated in describing phase 2, *supra*, only one-half of the underwriting gain is taxed currently because of the difficulty of determining, on an annual basis, the true income of life insurance companies. Where, however, the company distributes dividends to stockholders which exceed investment income and that half of underwriting gain previously taxed, it is evident that the company itself has determined that such dividends constitute income no longer needed for policyholders' contracts. Phase 3 therefore provides, as set forth in section 815, that after December 31, 1958, income distributed by life insurance companies to stockholders in excess of the amounts already taxed on a current basis is to be included in the regular income tax base of the insurance company.[13]

In preparing its income tax return for the calendar year 1958, petitioner, in computing its gain from operations under phase 2 of the 1959 Act, claimed a deduction for death benefits in the amount of $78,168,093.16, pursuant to section 809(d)(1). Of that amount, $31,672,514.42 represented the total accident and health benefits paid or accrued during 1958 as reflected in Schedule H of petitioner's 1958

---

[10] Mortality savings accrue from the fact that debts have not occurred as soon as assumed when the life insurance premiums and reserves were established. Loading savings arise from lower than estimated expenses for placing policies on the books and servicing them from that time forward. 1959–2 C.B. 774.

[11] Only one-half of the underwriting gain is taxed under phase 2 because of the inherent difficulty of accurately establishing the actual annual income of life insurance companies. Due to the long-term nature of their contracts, amounts which may appear to be income in the current year and as proper additions to surplus may, because of unexpected contingencies, later be required to fulfill insurance contracts. Due to this problem of arriving at true underwriting gains on an annual basis, the Act taxes only 50 percent of this gain on a current basis. 1959–2 C.B. 775.

[12] Thus, since petitioner's 1958 income tax return revealed that its gain from operations ($4,727,988.12) was less than taxable investment income ($4,977,988.12), it computed its tax on the former amount.

[13] Cf. secs. 802(b)(3) and 815. As was pointed out in fn. 8, *supra*, phase 3 is not applicable to mutual life insurance companies such as petitioner, but is set out above for the sole purpose of providing a balanced presentation of the 1959 Act.

annual statement. Also included in the $78 million death benefits deduction, and in addition to the $31 million accident and health category, was the amount of $667,448.38 which, like the $31 million category, was intended by petitioner to reflect accident and health benefits paid or accrued in 1958 but, unlike the $31 million amount, was nowhere reflected in petitioner's 1958 annual statement as accident and health benefits paid or accrued.

In computing gain from operations under phase 2 of the 1959 Act, section 809(c)(2) provides, in substance, that a net decrease in reserves, as computed under section 810(a),[14] is treated as an income item whereas section 809(d)(2) provides, in substance, that a net increase in reserves, as computed under section 810(b),[15] is treated as a deduction item. Since the net change in reserves as computed under section 810(a) and (b) is the difference between the beginning and ending reserves, and since the 1959 Act was made retroactive to January 1, 1958, if for any reason any of the petitioner's beginning 1958 reserves were erroneously overstated and the respective ending 1958 reserves were correct, the result would be an understatement of the increase in such reserves (or an overstatement of the decrease in such reserves where ending reserves were less than beginning reserves), resulting, in either case, in an overstatement in the gain from operations (or an understatement in the loss from operations where a loss was reported).

Petitioner's income tax return for 1958 was filed on March 14, 1960, subsequent to the enactment of the 1959 Act. Petitioner computed its phase 2 gain from operations by considering, among other things, the net increase or decrease in the various claim reserve categories of its insurance business. In preparing its 1958 return, petitioner realized that an overstatement in any of its beginning reserves would result in an increase in its gain from operations. In exercising actuarial hindsight, petitioner determined that the beginning 1958 reserves in question were overstated and should be adjusted downward to equal the "total losses incurred" attributable to these claim categories.[16] In making those adjustments, petitioner attempted to restate the beginning 1958 reserves in question so as to reflect as nearly as possible its actual experience.

---

[14] SEC. 810. RULES FOR CERTAIN RESERVES.

(a) ADJUSTMENT FOR DECREASE.—If the sum of the items described in subsection (c) as of the beginning of the taxable year exceeds the sum of such items as of the close of the taxable year (reduced by the amount of investment yield not included in gain or loss from operations for the taxable year by reason of section 809(a)(1)), the excess shall be taken into account as a net decrease referred to in section 809(c)(2).

[15] SEC. 810(b). ADJUSTMENT FOR INCREASE.—If the sum of the items described in subsection (c) as of the close of the taxable year (reduced by the amount of investment yield not included in gain or loss from operations for the taxable year by reason of section 809 (a)(1)) exceeds the sum of such items as of the beginning of the taxable year, the excess shall be taken into account as a net increase referred to in section 809(d)(2).

[16] For an explanation of "total losses incurred," see fn. 3, *supra*. By substituting "total losses incurred" for the beginning 1958 reserves in question, petitioner attempted to have beginning reserves reflect the actual liability incurred for those claim categories.

The effect of the adjustments was to increase the section 809 (d) (1) death benefits deduction, resulting in a corresponding reduction in petitioner's phase 2 gain from operations. In refusing to allow the downward adjustment to the beginning 1958 reserves in question, the Commissioner stated the following at page 5 of his deficiency notice dated December 24, 1964:

It is determined that you overstated death benefits etc. deduction for the year 1958 in the amount of $667,448.28 [sic] by improperly decreasing the accident and health claims reserve as of December 31, 1957 in the amount of $667,448.28 [sic]. Therefore, the deduction for Death Benefits etc. under Section 809 (d) is decreased by this amount.

Petitioner contends that because of special circumstances existing at the end of 1957, it overestimated the beginning 1958 reserves in question, causing a corresponding increase in its 1958 taxable income. Petitioner argues from this that if the alleged overstatements are not corrected for 1958, its income tax liability will not only be erroneous for that year but, because of the nature of the tax computation required under the 1959 Act, it will never be corrected in any later year. Assuming, *arguendo*, that the 1959 Act would have such an irreparable effect on petitioner's tax liability, petitioner's argument, as stated, is a plea for equitable relief. Such an argument cannot be considered by this Court since we lack equity jurisdiction. *Commissioner* v. *Gooch Co.*, 320 U.S. 418 (1943); *Lorain Avenue Clinic*, 31 T.C. 141 (1958); *Edward P. Clay*, 46 T.C. 505 (1966).

Petitioner contends, however, that it was the intention of Congress in passing the 1959 Act to permit aggrieved taxpayers to correct any distortion of income caused by overstatements in beginning 1958 reserves. Petitioner's support for this position rests upon its interpretation of a statement made by Senator Carl Curtis during Senate debate on the bill which became the 1959 Act and a letter received by the Senate Finance Committee from the Treasury Department. A brief history of the subject legislation will place petitioner's contention in proper perspective.

The Life Insurance Company Income Tax Act of 1959, retroactive to January 1, 1958, was introduced in the House of Representatives on February 9, 1959.[17] As drafted, the bill contained no provision which would have allowed an insurance company to retroactively adjust any of its beginning 1958 reserves. The Senate Finance Committee amended the House version of the bill by adding a section numbered 811 (b) (3) which provided that in computing the deduction for "Dividends to Policyholders" under section 811, an insurance company could report the amount "actually paid" as dividends during 1958, thereby permitting a company to retroactively adjust its beginning

---

[17] H.R. 4245, 86th Cong., 1st Sess. (1959).

1958 reserves for dividends.[18] However, while the legislation was pending in the Senate, the Treasury Department was requested by the then chairman of the Senate Finance Committee, Harry Flood Byrd, to render its opinion on a proposed amendment to delete section 811(b)(3) from the bill. The Treasury Department's opinion, as stated in a letter dated May 19, 1959, and signed by the then Assistant to the Secretary, David A. Lindsay, read as follows:

> This is in reference to your request for our opinion on a proposed amendment to H.R. 4245, the pending life insurance company income-tax bill, dealing with the special rule under section 811(a)(3) [sic], which provides a special rule for the 1958 reserve for dividends to policyholders.
>
> This special rule was originally included in H.R. 4245 for the relief of certain companies which had overstated their reserve for policyholder dividends at the end of 1957, due to technical errors, caused, in certain cases, for example, by the introduction of new data-processing equipment.
>
> It is further understood that the introduction of this special relief rule will work unintended hardship on certain other companies. Accordingly, it has been suggested that an amendment be adopted to take care of this situation by eliminating section 811(a)(3) [sic], thus leaving the adjustment for the error in the starting policy dividend reserve to administrative action.
>
> The Department would have no objection to such an amendment. [105 Cong. Rec. 8435.]

During Senate debate on the bill, Senator Carl Curtis took occasion to make the following remarks:

> In addition to the foregoing, I should like to invite attention to a relatively minor matter of somewhat technical nature on which I fear the language and intent of the bill might be misconstrued if some appropriate explanation were not made. The point is this: Most appropriately, section 811(b)(3) of the bill, which was added by the committee, makes it perfectly clear that where through inadvertent error, a life insurance company's reserve and policyholders dividends at the beginning of 1958 were overstated, the error is to be corrected in computing the company's taxable income for 1958 by referring to the dividends actually paid by the company during 1958.
>
> The point I wish to make clear is that there are a good many other types of beginning 1958 reserves which enter into computation of the taxpayers' 1958 taxable income. Any error in any of those opening reserves will result in an erroneous computation of taxable income, if not corrected. Such errors should be corrected in making the tax computations, whether the errors were protaxpayer or progovernment. If such errors are not corrected, the result is an inaccurate and erroneous computation of tax, which, because of the nature of the tax computation, will never be corrected. I think it quite clear that, even without any special provision in the bill itself, a taxpayer or the Internal Revenue Service, as the case may be, has ample authority under other law to correct any error in any opening reserves, in computing taxable income under this bill. Since I understand that to be the law, I am not offering any amendment to the bill on this point, but thought it well to make the record on it completely clear. [105 Cong. Rec. 8430.]

---

[18] S. Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 813.

On May 19, 1959, the Senate voted to print a version of the House bill which contained neither section 811(b)(3) nor any similar provision. No further reference was made to that section by either House of Congress and the bill as enacted contained no such provision.

Petitioner contends that the foregoing statements "make it apparent that both Congress and the Treasury Department intended that a life insurance company would be allowed to correct its beginning 1958 reserves for error and that such adjustments should be handled administratively rather than by special legislation."

By their very nature, reserves are mere estimates whose accuracy is dependent upon the judgment and experience of the person establishing them. Congress explicitly recognized this fact when it defined "life insurance reserves" under the 1959 Act in terms of "computed or estimated" amounts.[19] We think that Congress thereby intended to treat life insurance reserves like any other reserves which, in the absence of legislative exception, may not be retroactively adjusted for purposes of correcting errors of judgment in the original estimate. Petitioner contends that there were a number of special circumstances which caused it to overstate the reserves in question. Assuming, *arguendo*, that this were the fact, we fail to perceive its importance since petitioner's actuary testified that he established the reserves in question based upon all available information and, further, that there was no mathematical error in their computation. We think petitioner reads too much into that part of the legislative history relied upon. The Treasury's letter specifically recognized that the proposed amendment, sec. 811(b)(3), was intended to permit adjustment to insurance reserves which were overstated "due to technical errors." Similarly, Senator Curtis' remarks indicated that the amendment permitted retroactive adjustment only to those reserves which had been overstated "through inadvertent error." In rejecting petitioner's legislative interpretation, we conclude that neither the legislative history relied upon nor any other law or regulation brought to our attention would permit an insurance company to retroactively adjust an insurance reserve which, at the time it was established, was based upon all available information and contained no mathematical error.

However, even if we could interpret the foregoing statements as imparting a congressional intention to allow an insurance company to retroactively adjust beginning 1958 reserves where its actual experience showed the reserves to be overstated, we would be required to hold against petitioner for another reason. In attempting to justify the downward adjustments made to its beginning 1958 group accident and health claim reserves and individual hospital and medical claim re-

---

[19] Sec. 801(b)(1).

serves, petitioner's contentions, as discussed *supra*, are necessarily based upon the assumption that its beginning 1958 reserves were over-stated. The validity of this assumption, because of its critical importance to those contentions, warrants careful consideration.

Petitioner adjusted only two of the five categories of beginning 1958 accident and health claim reserves shown in Schedule O of its 1958 annual statement: "Group Accident and Health," $580,785.46, and "Hospital and Medical Expense," $86,662.92, for a total downward adjustment of $667,448.38. Petitioner supports the downward adjustment to these claim reserves on the ground that they were erroneously estimated, or overstated. In support of the alleged overstatements, petitioner relies upon a test used by the insurance commissioner of California for determining adequacy of reserves. Under that test, as employed by petitioner, beginning reserves are reduced by the "total losses incurred" for the particular year under consideration.[20] The difference, when divided by "total losses incurred," yields a figure designated by petitioner as "percentage excess of beginning reserves over total losses incurred" and is intended to reflect, as a percentage, the extent of overstatement of beginning reserves. Application of the test to the two claim categories in question shows that the beginning 1958 reserves were overstated by 13.41 percent, an amount several times larger than that obtained when the test was applied to the same claim categories for the years 1957, 1959, 1960, and 1961. However, before we may accept the percentage deviation arrived at by this test, an examination of the underlying components used in calculating that figure is required.

The accuracy of the result obtained from the application of the foregoing test is dependent upon only two components, one, the amount of beginning reserves under consideration and two, the "total losses incurred" on the claim categories to which those reserves relate. Whereas the amount representing beginning reserves consists of the actual amount used in establishing those reserves, the amount designated "total losses incurred" is, by definition, based in part on an estimate.[21] Thus, if the estimated component of "total losses incurred" is inaccurate, the percent of error of beginning reserves will likewise be inaccurate. Although the uncontradicted testimony at trial revealed that petitioner could have determined on the date of the filing of the return here involved, the exact liability incurred with respect to the claim categories in question, petitioner chose not to do so, but instead relied on its estimate of incurred liability in computing the alleged amount of overstatement, $667,448.38, as well as the percentage deviation figure of 13.41 percent. Inasmuch as petitioner has never determined the true liability for the claim categories in question, there is

---

[20] For an explanation of "total losses incurred," see fn. 3, *supra*.

[21] See fn. 3, *supra*.

no assurance that the amounts actually paid on those categories were in fact more or less than the beginning 1958 reserves prior to adjustment thereof. Lacking such assurance, we cannot conclude that the reserves in question were either overstated or understated.

Petitioner attempts to mitigate this fact by arguing that the period of group accident and health claim payments is a very short one inasmuch as the term of the policy is for 1 year renewable. Thus, petitioner argues, the claims incurred as of December 31 of any given year are largely paid out as of December 31 of the following year. In support of this argument, petitioner points out that the total dollar amount of the estimated component of "total losses incurred" for the claim categories in question was only $90,024, or 1.59 percent of the total beginning reserves in question. While this fact constitutes some evidence which might tend to support the accuracy of the estimated component of petitioner's "total losses incurred" figures for the year in question, petitioner has still failed to prove the actual liability incurred, and having failed in this respect, there is no showing in the record that the beginning 1958 reserves in question were actually overstated. Thus, even if we were of the view that Congress had expressed an intent to permit retroactive adjustment to beginning 1958 reserves, which we are not, we would still be required to hold against petitioner for failure to prove any overstatement in such reserves.

### Issue 2. Construction Fees

#### FINDINGS OF FACT

During the tax years 1958 through 1961, petitioner made mortgage loans for the construction of new buildings (hereinafter construction loans) and loans on existing buildings (hereinafter regular loans). With respect to its regular loans, petitioner charged the borrower a "loan service fee" or "lender's fee," and with respect to its construction loans, petitioner charged the borrower a "construction fee." These fees were in addition to the normal interest rate charged on such loans. In petitioner's experience, although construction loans involve an element of risk, they are no more hazardous than regular loans and at any given time and place the interest rate on a construction loan is likely to be the same as that on a regular loan. The construction fee constituted a percentage of the principal amount of the loan and varied from ½ to 2 percent. Both the loan service fee and the construction fee were arrived at by negotiation, both being influenced by the availability of mortgage money at the time and place the loan was made. On its income tax return for the years in question, petitioner included the total loan service fees in its gross investment income but failed to include any of its construction fees in gross investment income.

Petitioner operates a mortgage loan department whose function is the investment of its funds in regular and construction loans, secured by real estate, as well as the servicing of such loans. In addition to home office personnel, petitioner's mortgage loan department has several field offices located in various parts of the country with salaried employees who make loans and provide services in connection with such loans directly to borrowers. Few major life insurance companies operate directly in this manner. Most major life insurance companies purchase mortgage loans from mortgage loan brokers, mortgage loan correspondents, banks, savings and loan associations, and finance companies, or they place their mortgage loans through mortgage loan brokers and correspondents. During the years in question petitioner placed a limited volume of mortgage loans through mortgage loan brokers, referred to by petitioner as preferred brokers.

During the years in question, petitioner's general procedure in making regular loans was essentially as follows: In the initial contact with a prospective borrower, petitioner inquired as to the amount desired and the type of property involved. If the proposal appeared attractive, the loan representative inspected and appraised the property. If the property met expectations, negotiations as to the exact terms of the loan were commenced. Included in those negotiations was the amount of the loan service fee to be charged by petitioner. If agreement was reached, petitioner prepared a loan application embodying the agreement and submitted it to the borrower for his signature. Upon receipt of the signed application, the loan representative ordered a credit report and if the proposed loan was in excess of $25,000, the application was forwarded to the home office for approval. Where home office approval was obtained, a loan commitment issued and the closing procedure was begun, including the execution of a deed of trust or mortgage, and a promissory note. Applications for loans of $25,000 or less on single family dwellings could be approved in the field by authorized employees of petitioner.

Petitioner's general procedure in making construction loans was similar to that employed in making regular loans. However, since there was no existing structure to inspect and appraise, petitioner reviewed the plans and specifications for the building prior to accepting a loan application. This review was undertaken to determine that the size of the rooms and closets were adequate, that the layout was proper, and that the traffic flow of the structure was acceptable. If the loan application was accepted, petitioner executed a construction loan agreement which incorporated the terms of the application, including the amount of the construction fee. Concurrent with the execution of the construction agreement, the borrower executed a promissory note and mortgage or deed of trust. When the mortgage

or deed of trust was recorded, petitioner informed the borrower he could begin construction. In the situation where petitioner was not furnished with a survey, its loan man inspected the foundation to verify that its size and location on the lot were as set forth in the plans and specifications. Petitioner then notified the title company to issue a foundation report whereupon the first disbursement of loan funds was made. Thereafter, pursuant to the loan agreement, provision was made for the periodic inspection of the building under construction and the disbursement of funds upon the satisfactory completion of the various stages of construction. However, there was no relationship between the extra services incurred on construction loans and the construction fees charged the borrower. The amount of the fee was the result of negotiations between borrower and lender. The services rendered by petitioner in connection with its construction loans were essentially for petitioner's benefit and protection in determining whether to make the loan and, if made, for the subsequent safeguarding of the loan. Petitioner would not enter into a construction loan without reserving the right to perform such services for which a construction fee was always charged the borrower.

The same forms of real estate loan applications were used by petitioner for both its regular loans and its construction loans. The construction fee and the loan service fee, or lender's fee, were customarily set forth in the real estate application submitted by a prospective borrower, which fees were usually withheld from the first moneys disbursed by petitioner. Where a construction loan was placed through one of petitioner's preferred brokers, the borrower was charged both a loan service fee and a construction fee. In this situation, the construction fee was paid to the preferred broker, petitioner retaining the loan service fee.

During the years in question, petitioner investigated a substantial number of requests for construction loans, including a review of the plans and specifications, which, for one reason or another, did not result in the granting of a loan. In such instances, petitioner charged no fee to the unsuccessful borrowers.

The total construction fees received by petitioner during the years in question exceeded the expenses attributable to such fees by the following amounts and percentages:

| Year | Total construction fees | Total expenses | Excess of fees over expenses | Percentage of excess to expenses |
|------|------|------|------|------|
| 1958 | $221,326.60 | $57,176.40 | $164,150.20 | 287 |
| 1959 | 203,101.71 | 34,872.55 | 168,229.19 | 482 |
| 1960 | 233,469.11 | 44,700.96 | 188,768.15 | 422 |
| 1961 | 215,821.98 | 40,677.21 | 175,144.77 | 430 |

Although petitioner excluded construction fees in reporting its gross investment income during the years in question, it did not exclude any portion of gross investment expenses attributable to its mortgage loan operations. On September 16, 1963, petitioner paid additional tax based on calculations recorded in the revenue agent's report of examination (Form 1907) dated September 17, 1963. These calculations involved the elimination of the construction fees from gross investment income and the elimination from gross investment expenses of those expenses attributable to the income from its mortgage loan construction fees.

During the years in question, petitioner reported the construction fees as gain from operations under section 809(c)(3) in the calculation of underwriting income. In the deficiency notice dated December 24, 1964, the Commissioner determined that petitioner had improperly included such fees in underwriting income. Based upon this determination, petitioner's income for the years in question was adjusted by decreasing underwriting income in the amount of the construction fees and increasing investment income by the same amount.

OPINION

The question presented by this issue is whether the construction fees received by petitioner during the years in question were reportable as underwriting income pursuant to section 809(c)(3), as petitioner contends, or as investment income under section 804(b)(1), as respondent contends. Section 804(b)(1) provides as follows:

SEC. 804. TAXABLE INVESTMENT INCOME.

(b) GROSS INVESTMENT INCOME.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) INTEREST, ETC.—The gross amount of income from—

(A) interest, dividends, rents, and royalties,

(B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and

(C) the alteration or termination of any instrument or agreement described in subparagraph (B).

The definition of gross investment income contained in section 804 (b) of the Life Insurance Company Income Tax Act of 1959, first appeared as section 803(b) of the Life Insurance Company Tax Act for 1955.[22] Both the report of the House Committee on Ways and Means and the report of the Senate Committee on Finance stated the following with respect to section 803(b) of the 1955 Act:

Subsection (b)(1) includes in the definition of "gross investment income" the gross amount of any income, received or accrued, during the taxable year, from interest, dividends, rents, and royalties. *It is made clear that income includes*

---

[22] Act of Mar. 13, 1956, ch. 83, 70 Stat. 36.

*the gross amount received in conjunction with the making of any lease, mortgage, or other instrument or agreement from which the life insurance company will derive interest,* rents, or royalties, and the alteration or termination of any such lease, etc. Examples of such amounts would be a penalty for early payment of a mortgage and a bonus for entering into a lease. Any amount received in conjunction with an agreement which would be deemed a capital gain under other provisions of the Internal Revenue Code will not be included in gross investment income. [Emphasis added. H. Rept. No. 1098, 84th Cong., 1st Sess. (1955), 1956–1 C.B. 954, 961; S. Rept. No. 1571, 84th Cong., 2d Sess. (1956), 1956–1 C.B. 967, 974.]

A literal interpretation of section 804(b)(1)(B) clearly includes construction fees since that section specifically designates, as gross investment income, that income which is received from the entering into of any mortgage or other instrument from which the life insurance company derives interest. Petitioner contends, however, that construction fees do not constitute income from the "entering into" of a mortgage or other instrument. This contention is based on the theory that since Congress failed to define the phrase "income from the entering into," that phrase must be given its ordinary and accepted meaning which to petitioner is the consideration received for the *execution* of the agreement as distinguished from the consideration received for *performance* of the terms of the contract after its execution. Thus, petitioner argues that since the construction fee is imposed for the purpose of compensating petitioner for the services it renders under a construction loan, the fee relates only to the performance of the contract, not to its execution, and therefore must be excluded from the language of section 804(b)(1)(B). We reject this argument on the following grounds.

First, while petitioner contends that the construction fee was received as compensation for its services necessary to the performance of the construction loan, the testimony of petitioner's sole witness indicated that there was no relationship between the extra expense petitioner incurred on a construction loan and the construction fee charged, but rather, that the fee was negotiated by the lender and borrower and that it was determined by the existing mortgage money market. Even if it be conceded that some portion of the construction fee was used by petitioner to defer its expenses in providing services under a construction loan, petitioner's witness testified that those services were primarily, if not solely, for petitioner's benefit and protection. Petitioner's restrictive interpretation of section 804(b)(1)(B) is further weakened by the fact that the construction fee was an integral part of every construction loan made by petitioner. Constituting as it did a condition precedent to the very granting of such loan, the fee clearly constituted at least part of the consideration received by petitioner for the *execution* of the loan agreement.

An even more compelling reason for rejecting petitioner's argument lies in the wording of the statute itself. Thus, if the language in section 804(b)(1)(B) is considered in its ordinary, everyday sense, as indeed it must, *Malat* v. *Riddell*, 383 U.S. 569 (1966), there is no room for making the fine line of distinction so strongly relied upon by petitioner. Nor do we agree with petitioner, after reviewing the relevant legislative history of section 804(b)(1)(B), that Congress intended to exclude an item like construction fees from a definition as broad and sweeping as is contained in that section. Having determined that the construction fee is reportable as investment income under section 804(b)(1)(B) rather than underwriting gain under section 809(c)(3), we need not determine whether the fee might also constitute interest under section 804(b)(1)(A), as contended by respondent.

*Issue 3. Nature of Option Fee, Standby Fees, and Bond Commitment Fees*

FINDINGS OF FACT

During the year 1960, petitioner received $30,000 in consideration for an option to purchase or lease certain real property owned by petitioner. The option agreement provided that if the option was exercised, the option fee would be applied in substantial part toward the payment of the first purchase price installment or rental installment as provided under the option agreement. The option was never exercised.

During the years 1959 through 1961 petitioner received certain amounts, designated as "standby fees," in the amounts and for those years as follows:

| Year | Amount |
| --- | --- |
| 1959 | $8,322.50 |
| 1960 | 4,934.00 |
| 1961 | 14,048.16 |

Standby fees are amounts collected by petitioner from prospective borrowers in consideration of petitioner making a commitment to grant a mortgage loan at any time during a specified period. The agreement provides that if the mortgage loan is made, the standby fee is refunded to the borrower. The standby fees here material were received by petitioner for commitments which were never exercised by prospective borrowers.

During the year 1960, petitioner received "bond commitment fees" in the amount of $2,208.33, which fees were charged for commitments made by petitioner to prospective borrowers to guarantee the availability of funds up to a designated amount, during a specified period,

and at a predetermined rate of interest. The bond commitment fees in question relate only to commitments under which no money was actually borrowed.

In reporting income for the years in question, petitioner included all the above-described fees in its calculation of gain from operations under section 809(c)(3) of the Code. Respondent, in his notice of deficiency, disallowed petitioner's treatment of the fees as gain from operations on the ground that—

These items are a part of "Gross Investment Income", Section 804(b) of the Internal Revenue Code, as they constitute items includible under either Sections 804(b)(1) or 804(b)(3) of the Internal Revenue Code.

OPINION

As stated in issue 2, *supra*, section 804(b)(1)(B) provides that gross investment income includes the gross amount received from "the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties." Respondent contends that the fees in question should have been included in petitioner's gross investment income for the tax years involved. This contention is based upon respondent's interpretation of section 804(b)(1)(B) to include not only the entering into of agreements from which petitioner "derives" interest, rents, or royalties, but also the entering into of instruments from which petitioner "could have derived" interest, rents, or royalties. In support of his interpretation, respondent refers to section 1.804–3(a), Income Tax Regs., which provides that gross investment income includes the gross amount of income from:

3(a)(1)(iv) The entering into of any * * * instrument or agreement from which the life insurance company *may* derive interest, rents, or royalties [Emphasis supplied.]

In further support of his interpretation of section 804(b)(1)(B), respondent relies on the use of the phrase "in connection with" in the following congressional statement which discusses section 803(b) of the Life Insurance Company Tax Act for 1955, the statutory predecessor to section 804(b)(1)(B):

The gross income of a life insurance company under present law is defined as interest, dividends, and rents. This definition has been expanded by including (1) royalties; (2) certain amounts received *in connection with* entering into, altering, or terminating agreements such as leases and mortgages; and (3) income derived from the operation of a noninsurance business. Royalties are considered to be similar to rents. Similarly, the receipts in connection with certain agreements are considered similar to the income received under the agreements. These amounts would include, for example, a bonus on entering into a lease and a penalty for early repayment of a mortgage. * * * [Empha-

sis supplied. H.Rept. No. 1098, 84th Cong., 1st Sess. (1955), 1956–1, C.B. 954, 957; S.Rept. No. 1571, 84th Cong., 2d Sess. (1956), 1956–1 C.B. 967, 970.]

Irrespective of whether we would, under other circumstances, construe the foregoing regulation and congressional statement as supporting respondent's contention, we do not find it necessary to so decide inasmuch as the fees in question fall clearly within the ambit of section 804(b)(3).

Section 804(b)(3) provides, in pertinent part, that gross investment income includes "The gross income from any trade or business (other than an insurance business) carried on by the life insurance company." Attributing to the words "trade or business" their usual and ordinary meaning, we are satisfied from the record that the fees in question were derived from petitioner's business activities and that such activities were wholly unrelated to petitioner's insurance business. We therefore hold that the option fee, standby fees, and bond commitment fees were includable in petitioner's gross investment income under section 804(b)(3).

*Issue 4. Treatment of Gain From Sale of U.S. Treasury Bills*

### FINDINGS OF FACT

During the calendar year 1961 petitioner realized gain on the sale of its short-term U.S. Treasury bills, including Treasury Bills-Tax Anticipation Series, in the amount of $2,198.22. All said bills were issued on a discount basis with no specified interest payable at maturity. In computing its income tax liability for the year 1961, petitioner segregated the original discount accrued from the gain or loss realized upon the sale of said obligations. As a result, petitioner included only the accrual of discount in gross investment income under section 804(b)(1)(A) of the Code, and treated the remaining gain realized on the sale ($2,198.22) as gain from property other than capital assets, which was then included among "Other amounts" in the calculation of gain from operations under section 809(c)(3) of the Code.

### OPINION

Under section 818(b) of the Code, life insurance companies are required to accrue their discount on bonds on an annual basis, and under section 804(b)(1)(A) and the regulation thereunder, sec. 1.804–3(a)(1)(i), the accrued discount is reportable as gross investment income. Since petitioner reported its accrued bond discount in this manner in the year in question, the sole issue is whether the gain from the sale of its U.S. Treasury bills was properly included in gain from operations under section 809(c)(3), as petitioner contends, or

whether it too should have been reported in gross investment income, as respondent contends.

As set out in issue 2, *supra*, subparagraphs (B) and (C) of section 804(b)(1) provide, when read together, that gross investment income includes the gross amount of income from "the alteration or termination of any instrument or agreement * * * from which the life insurance company derives interest, rents, or royalties." From the foregoing statutory language, respondent argues that the gain received by petitioner from the sale of its U.S. Treasury bills was income from "the alteration or termination of an instrument from which the petitioner derived interest" and, as such, should have been included in gross investment income.

We fail to perceive how the sale of the Government obligations in question could satisfy the statutory requirement of an "alteration or termination." Since the record does not indicate that the obligations in question were canceled or retired, we must assume that, upon their sale by petitioner, they were purchased by some other investor. Thus, although the rights and liabilities formerly existing between petitioner and the Government ceased to exist, there was no alteration or termination of the bills and certificates in question. Under these circumstances petitioner could not, within the plain meaning of the statutory language in question, have properly included its gain from the sale of these securities within gross investment income pursuant to section 804(b)(1) (B) and (C). Neither was such gain includable in gross investment income as short-term capital gain, pursuant to section 804(b)(2), inasmuch as the Treasury bills in question have been excluded from the category of capital assets by virtue of section 1221 (5) of the Code.

In addition, an examination of the legislative history of section 804(b)(1), as set forth in issue 2, *supra*, satisfies us that Congress did not intend to include the *sale* of an instrument within the meaning of the phrase "alteration or termination." The only example provided in the House and Senate committee reports for illustrating the intended meaning of "alteration or termination" of an instrument was the "early payment of a mortgage." [23] We think that if Congress had intended to include income from the *sale* of an instrument within the gross investment income of section 804(b)(1)(C), it would have so provided. Having failed to do so, we must reject respondent's contention and hold that petitioner properly reported gain from the sale of its Government securities in its computation of gain from operations under section 809(c)(3).

---

[23] H. Rept. No. 1098, 84th Cong., 1st Sess. (1955), 1956–1 C.B. 954, 961; S. Rept. No. 1571, 84th Cong., 2d Sess. (1956), 1956–1 C.B. 967, 974.

140

FINDINGS OF FACT

For the years 1958 through 1961, petitioner, in the computation of its phase 2 gain from operations, deducted the following amounts as constituting 3 percent of the premiums attributable to its nonparticipating accident and health contracts, pursuant to section 809(d)(5) of the Code:

| Year | Amounts left on deposit | Noncancelable [1] A & H | Guaranteed renewable A & H |
|---|---|---|---|
| 1958 | $55,153.05 | $8,376.77 | $23,660.52 |
| 1959 | 38,483.55 | 6,452.40 | 30,568.66 |
| 1960 | 33,195.48 | 4,882.03 | 30,531.62 |
| 1961 | 41,091.84 | 3,558.97 | 37,543.01 |

[1] Although respondent, in his deficiency notice disallowed petitioner's deduction for noncancelable accident and health insurance, respondent now concedes that these amounts were properly deducted pursuant to sec. 809(d)(5).

The parties have conceded and we find that the figures representing "amounts left on deposit" were overstated in all years reported and the correct figures are as follows: 1958, $54,065.78; 1959, $36,875.71; 1960, $32,344.57; and 1961, $39,313.73. The "amounts left on deposit" consist of amounts arising from death benefit proceeds, matured endowment policies, and cash surrender values. These amounts were left on deposit with petitioner at designated interest rates in accordance with settlement options 1 and 2 of the policies from which they arose. If a beneficiary or insured elected a settlement under option 1 or 2 of the policy, petitioner was required to retain the proceeds from the policy for a period not to exceed 5 years (under option 1) or 10 years (under option 2). The amounts so retained under settlement options 1 and 2 were subject to withdrawal by the payee at any time except (1) a withdrawal could not be less than a specified dollar amount; (2) should any withdrawal be sufficient to reduce the retained balance to less than $1,000, the entire amount could be paid in one sum; and (3) petitioner could defer any withdrawal for a period not exceeding 90 days. In addition to the prescribed rate of interest payable under option 1 or 2, the payee was also entitled to participate in any excess interest earnings of the company, although he had no right to participate in the company's divisible surplus.

The guaranteed renewable accident and health contracts here material provided disability income benefits and were issued only to those insureds whose age did not exceed 59 years. Under the terms of such policy, the insured was given the right to renew the policy for consecutive periods of 1 year each to age 65 by payment of the renewal premium for each such term. Petitioner reserved the right to change

the renewal premium on the basis of its applicable rate tables in effect on the due date provided that (1) no change was made in the rate tables applicable to the insured's policy unless such change was also made applicable to all policies providing like benefits and renewal rights and in the same rating class; (2) the rating class of the insured's policy was not changed because of any change in the insured's status, such as change of physical condition or occupation; and (3) each renewal premium was to be determined in accordance with the rating class and age of the insured at the date of issue. Petitioner computed the premium rates on such guaranteed renewable accident and health policies on the basis that the premium would remain level to age 65, the same as it does for a life insurance policy with a term to age 65.

### OPINION

In determining its phase 2 tax base, petitioner deducted 3 percent of the net premiums attributable to its noncancelable accident and health and guaranteed renewable accident and health policies, plus 3 percent of amounts left on deposit under settlement options arising from life insurance death benefit proceeds, matured endowment policies, and cash surrender values. Petitioner claimed these deductions under section 809(d)(5) of the Code, which provides as follows:

SEC. 809. IN GENERAL.

(d) DEDUCTIONS.—For purposes of subsections (b)(1) and (2), there shall be allowed the following deductions:

\*  \*  \*  \*  \*  \*  \*

(5) CERTAIN NONPARTICIPATING CONTRACTS.—An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year (excluding that portion of the premiums which is allocable to annuity features) attributable to nonparticipating contracts (other than group contracts) which are issued or renewed for periods of 5 years or more. For purposes of this paragraph, the term "reserves for nonparticipating contracts" means such part of the life insurance reserves (excluding that portion of the reserves which is allocable to annuity features) as relates to nonparticipating contracts (other than group contracts). For purposes of this paragraph and paragraph (6), the term "premiums" means the net amount of the premiums and other consideration taken into account under subsection (c)(1).

In an attempt to justify its deduction of 3 percent of the "amounts left on deposit," petitioner contends, by a series of somewhat strained interpretations, that such amounts satisfy the statutory requirement of section 809(d)(5) which permits a taxpayer to deduct 3 percent of "premiums \* \* \* attributable to nonparticipating contracts \* \* \* which are issued or renewed for periods of 5 years or more." The reason for including the alternative 3 percent deduction of certain

premiums in section 809(d)(5) was explained by the Senate Finance Committee as follows:

5. *Deduction for nonparticipating policies.*—Policyholder dividends in part reflect the fact that mutual insurance is usually written on a higher initial premium basis than nonparticipating insurance, and thus the premiums returned as policyholder dividends, in part, can be viewed as a return of redundant premium charges. However, such amounts provide a "cushion" for mutual insurance companies which can be used to meet various contingencies. To have funds equivalent to a mutual company's redundant premiums, stock companies must maintain relatively larger surplus and capital accounts, and in their case the surplus generally must be provided out of taxable income. To compensate for this, the House bill allows a deduction for nonparticipating insurance equal to 10 percent of the increase in life insurance reserves attributable to nonparticipating life insurance (not including annuities). Your committee has recognized the validity of the reasons for providing such a deduction and has therefore continued it in your committee's version of the bill. However, basing this addition, as does the House bill, only upon additions to life insurance reserves does not take account of the mortality risk factor present in policies involving only small reserves. To overcome this deficiency, your committee's amendments provide that a special 3 percent deduction based on premiums is to apply, instead of the 10 percent deduction, where it results in a larger deduction. This is a deduction equal to 3 percent of the premiums for the current year attributable to nonparticipating policies (other than group or annuity contracts) issued or renewed for a period of 5 years or more. [S.Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 786.]

We conclude from the foregoing statement that when Congress employed the phrase "premiums * * * attributable to nonparticipating contracts," it did not intend to include amounts which, as in the instant case, are no more than proceeds or cash surrender values of matured or canceled life insurance or endowment policies as to which proceeds there were no future contingencies or risks involved on the part of petitioner. To include such amounts within the phrase "premiums * * * attributable to nonparticipating contracts" would not only strain the intendment of the statute but would totally disregard the rationale upon which section 809(d)(5) rests. For these reasons we conclude that as to the "amounts left on deposit," respondent properly disallowed petitioner's section 809(d)(5) deduction based thereon.

However, petitioner's claimed deduction of 3 percent of the premiums attributable to its guaranteed renewable accident and health contracts, pursuant to section 809(d)(5), presents a different situation. Here, unlike the "amounts left on deposit," petitioner actually received premiums attributable to existing insurance contracts, which contracts respondent concedes were of a "nonparticipating" nature. Thus the narrow issue for determination is whether the policies in question were "issued or renewed for periods of 5 years or more," as required by section 809(d)(5).

The guaranteed renewable contracts under consideration were issued only to those persons who were 59 years of age or less on the issuance date. Pursuant to the terms of the policy, the insured had the right, prior to his 65th birthday, to renew the policy for consecutive terms of 1 year each by mere payment of the annual renewal premium. Although petitioner reserved the right to change the renewal premium, any such change had to be made as to all insureds in the same rate class, irrespective of possible changes in the insured's physical condition or occupation. Thus, an insured could continue his policy in force for a period of "5 years or more" by the timely payment of his renewal premium. In establishing the 3-percent alternative deduction, the Senate Committee on Finance discussed the 5-year requirement as follows:

The determination of whether a contract meets the 5-year requirement will be made as of the date it was issued, or as of the date it was renewed, whichever is applicable. Thus, a 20-year nonparticipating endowment policy will qualify under section 809(d)(5), even though the individual insured subsequently dies at the end of the second year, since the policy was issued for a period of 5 years or more. *However, a 1-year renewable term contract will not qualify, in that as of the date it was issued (or of any renewal date) it was not issued (or renewed) for a period of 5 years or more.* In like manner, a policy originally issued for a 3-year period and subsequently renewed for an additional 3-year period will not qualify. However, if this policy were renewed for a period of 5 years or more, the policy would qualify under section 809(d)(5) from the date it was renewed. * * * [Emphasis supplied. S.Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770, 810.]

Respondent contends that since petitioner retained the right to adjust renewal premiums on its guaranteed renewable accident and health contracts, those contracts were indistinguishable from 1-year renewable term contracts. Relying on the emphasized language in the above-quoted committee report, as well as section 1.809-5(a)(5) (iv), Income Tax Regs., to the same effect, respondent concludes that the premiums attributable to petitioner's guaranteed renewable contracts do not qualify for the 3-percent alternative deduction.

While we do not question the fact that petitioner retained the right to alter renewal premiums on the contracts in question, we note, as set forth in our findings, *supra*, that those contracts imposed substantial limitations on such premium changes. In addition and of greater significance in distinguishing petitioner's guaranteed renewable contracts from the 1-year renewable term contracts referred to in the above-quoted Senate committee report, is the fact that, under the former contracts, petitioner guaranteed the renewal of the policies and all their provisions for a period of 5 years or more. Thus, the only way the term of petitioner's guaranteed renewable contracts could have been shortened to less than 5 years was for an insured to either volun-

tarily cancel his policy or fail to make timely premium payments thereon. Since these possibilities are within the exclusive control of the insured and exist not only with regard to petitioner's guaranteed renewable contracts but with virtually all insurance contracts "issued or renewed for a period of 5 years or more," we think the insurance contracts in question satisfy the statutory definition of section 809 (d) (5) in that they are, in essence, "issued * * * for periods of 5 years or more." The 1-year option guarantee is not a "renewal" but rather part and parcel of the original insurance contract. The insured's coverage under the contract continues for the full 5-year period subject only to petitioner's right to increase annual premiums within stated limits. In substance, the contract guarantees the insured's "renewal" right, not for 5 successive yearly periods, but for one 5-year period with the right in petitioner to alter the premium. If we were to hold that the term of petitioner's guaranteed renewable policies in question was less than 5 years merely because an insured had the power to terminate such a policy, we would be required to hold the same way as to all nonparticipating insurance contracts, even though the policy was issued for 5 years or more. Since we are convinced that such a result is manifestly excluded by the language employed in section 809 (d) (5), we conclude that petitioner's guaranteed renewable policy was "issued * * * for a period of 5 years or more" and that petitioner was entitled to use the 3-percent alternative deduction in computing its phase 2 gain from operations under section 809.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

------

SIMPSON, *J.*, dissenting: I agree with the conclusions of the majority concerning the first four issues, but I must disagree in part with the conclusions in issue 5. It seems to me that the guaranteed renewable policies issued by the petitioner were not issued for 5 years within the meaning of section 809 (d) (5).

The purpose of allowing the 3-percent deduction provided in section 809 (d) (5) was to permit insurance companies issuing nonparticipating policies to accumulate additional surplus tax-free. Companies issuing participating policies can charge larger premiums and in this manner retain surplus to protect against unanticipated adverse experience. The additional surplus which can be accumulated by reason of section 809 (d) (5) provides similar protection for companies issuing nonparticipating policies.

Although the legislative history fails to explain the reason for the requirement that the policy be issued for 5 years, it seems clear that the accumulation of increased surplus was necessary only when the

insurance company was committed for a 5-year or longer period. If the company is free to adjust its rates at any time when its experience proves to be more unfavorable than expected, there is no need for allowing the tax-free buildup of increased surplus. In the case of noncancellable accident and health policies, the company cannot adjust its rates notwithstanding unfavorable experience. However, in the case of the guaranteed renewable policies involved herein, petitioner could alter its rate schedule. It could not increase the rates of an individual policyholder merely because he became an increased risk, but it could increase the rates for the class of policies if it became apparent that the risks for the whole class were greater than expected.

In deciding whether a guaranteed renewable policy is issued for 5 years, I recognize that such a policy may be continued for 5 or more years and that in some respects the company is committed—it cannot decline to renew the policy at the end of any year and can make only limited changes in its terms. However, since the company is free to adjust its rate schedule, there is no reason to permit the tax-free accumulation of additional surplus to protect against unanticipated risks in connection with these guaranteed renewable policies; and accordingly, I have concluded that these policies are not issued for 5 years within the meaning of section 809(d)(5).

RAUM and TANNENWALD, *JJ.*, agree with this dissent.