HOME MUTUAL INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6587–75.     Filed September 18, 1978.

*Paul A. Pakalski* and *Michael T. Hart*, for the petitioner.
*Nelson E. Shafer*, for the respondent.

OPINION

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal mutual insurance company income taxes for the taxable years 1966 and 1971 in the respective amounts of $29,906.21 and $18,624.50. The issues for decision are as follows:

(1) Should petitioner be permitted to adjust its estimate of unpaid losses as of December 31, 1962, in each of its subsequent taxable years based strictly upon settlements of its claims which had been estimated on that date;

(2) In the alternative, must recoveries (salvage and subrogation) on losses paid prior to January 1, 1963, be offset against losses incurred in a subsequent year for purposes of computing statutory underwriting income; and

(3) Is the special transitional underwriting loss an allowable reduction to the full extent of underwriting gain before the protection against loss deduction under section 824,[1] of the

---

[1]All section references are to the Internal Revenue Code of 1954, as amended.

Internal Revenue Code, or only to the extent of statutory underwriting income after allowance of the protection against loss deduction.

The case was submitted upon a complete stipulation of facts. The stipulation of facts and exhibits attached thereto are incorporated by this reference.

Home Mutual Insurance Co. (petitioner) is a mutual casualty insurance company with its principal office at Appleton, Wis. Petitioner filed Federal mutual insurance company income tax returns (hereinafter referred to as returns) for the taxable years 1963, 1964, 1965, 1966, and 1967 with the District Director of Internal Revenue, Milwaukee, Wis., and like returns for the taxable years 1971 and 1972 with the Internal Revenue Service Center, Kansas City, Mo. Petitioner filed an amended return for the taxable year 1963 with the District Director of Internal Revenue, Milwaukee, Wis., on June 9, 1965.

In each State (Wisconsin and 16 other States)[2] where petitioner is authorized to act as an insurer, petitioner is required to file statements of its financial condition and the results of its annual operations. These annual statements are presented on forms prescribed by the National Association of Insurance Commissioners and completed in accordance with instructions prepared by that organization.

A brief history and explanation of the general scheme of taxation of mutual fire and casualty insurance companies is in order to aid an understanding of the issues in this case. The Revenue Act of 1962 (Pub. L. 87–834) drastically increased the tax on mutual fire and casualty insurance companies. Prior to that time such companies were taxed under one of two formulas which produced the higher tax. Under one formula they were taxed at ordinary corporate rates on their investment income and were not taxed on their income from premiums (underwriting income). Under the other formula they paid a tax of 1 percent on their gross investment income plus their premium income less policyholder dividends. At the same time stock fire and casualty insurance companies were taxed at ordinary corporate income tax rates on their investment income and underwriting income. The 1962 Act was designed to tax the

---

[2]Idaho, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Missouri, Montana, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Utah, and Washington.

mutual companies on much the same basis as the stock companies, recognizing however, that while a stock company could pay extraordinary losses out of paid-in capital as well as accumulated profits, a mutual company was able to pay extraordinary losses only out of retained underwriting income. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 446; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 761. The 1962 Act, therefore, established a new scheme of taxation for mutual fire and casualty insurance companies under which they would be taxed for taxable years commencing after December 31, 1962, on both their investment income and underwriting income with certain modifications.

Under the 1962 Act, which became sections 821 through 826 of the Internal Revenue Code of 1954, as amended, a normal tax and surtax were imposed on "mutual insurance company taxable income."

Mutual insurance company taxable income consists of taxable investment income and statutory underwriting income with certain specified modifications. The case before us involves statutory underwriting income. That term, in general, means the premiums earned on insurance contracts less expenses incurred, losses incurred, deductions allowable under section 832(c), and modifications with which we are not concerned in this case.

## 1. *Loss Incurred Deduction*

The deduction allowed against statutory underwriting income for losses incurred is computed under section 832(b)(5) which provides:

SEC. 832(b)(5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

The first issue presented for decision involves the deduction for losses incurred for each of the taxable years 1963 through 1966 and 1971, liabilities for the first 3 years properly being before the Court by reason of loss carryovers.

The following schedule reflects the loss incurred deduction involved in each of the years:

| Taxable year | Claimed on tax return | Determined in statutory notice | Claimed in amended petition | Amount in dispute |
|---|---|---|---|---|
| 1963 ... | [1]$3,148,344.52 | $3,071,255.44 | $3,287,553.53 | $216,298.09 |
| 1964 ..... | 3,023,573.82 | 3,004,779.83 | 3,111,107.06 | 106,327.23 |
| 1965 ..... | 3,002,569.02 | 2,993,200.41 | 3,016,564.59 | 23,364.18 |
| 1966 ..... | 3,563,129.09 | 3,547,468.39 | 3,569,133.90 | 21,665.51 |
| 1971 ..... | 5,339,165.39 | 5,339,165.39 | 5,340,329.39 | 1,164.00 |

[1]Amended tax return.

The adjustments to the loss incurred deduction made by the Commissioner in his statutory notice of deficiency were based upon his determination that loss recoveries in each of the years were not excludable from the related loss incurred deductions. Petitioner challenges that determination in the alternative. Petitioner's primary contention is that it is entitled to additional unpaid loss deductions brought about by satisfying claims during each of the years reflected above for less than was estimated as of December 31, 1962, to be its liability for such claims pending on that date.

Petitioner, on its annual statement as of December 31, 1962, reported its unpaid losses at $2,729,746. This amount represented petitioner's evaluation of the amount of money necessary to meet all contingencies of claims against its insurance policies on that date. It was composed of $2,600,472 for losses which had been reported to it by its policyholders and analyzed case-by-case to ascertain the projected ultimate liability and $129,274, representing an estimate of the losses incurred but not reported to petitioner by its policyholders as of December 31, 1962. Prior to December 31, 1962, the loss incurred account on petitioner's books and records and financial statements had no effect on the Federal taxation of petitioner's income because mutual insurance companies were not taxable on underwriting income prior to the taxable year 1963. The loss incurred account as of December 31, 1962, did, however, affect petitioner's tax liabilities for taxable years beginning with the taxable year 1963 because of the manner in which the loss incurred deduction is computed. The unpaid losses outstanding at the end of the taxable year are added to the losses paid during the taxable year and the unpaid losses at the beginning of the taxable year are deducted from that total. Sec. 832(b)(5), *supra*. The portion of

petitioner's unpaid loss deduction which was estimated for losses not yet reported as of December 31, 1962 ($129,274), was converted during the taxable year 1963 to reported losses. As losses were reported to the petitioner by policyholders in 1963 petitioner evaluated its liability for the claims, added such estimated liability to the portion of its losses incurred for reported losses, and reduced the portion attributable to unreported losses.

Petitioner's unpaid loss account balance at December 31, 1962, affected not only its loss incurred deduction for the taxable year 1963 but all of its taxable years through 1975 because all of the claims pending on December 31, 1962, were not finally settled until 1975. In 1963 and each of the subsequent years petitioner evaluated its unpaid losses in like manner as of December 31 which not only included claims filed in each year but also the unsettled claims which had been pending on December 31, 1962, which it had evaluated as of December 31, 1962. The unpaid loss evaluation for December 31, 1963, and subsequent dates, unlike the evaluation on December 31, 1962, affected petitioner's loss incurred deduction and its tax liability for each immediately preceding and each immediately succeeding taxable year because of the effect on the formula prescribed by section 832(b)(5), *supra;* i.e., beginning and ending of the year balances of unpaid losses.

The parties have stipulated the following description of the method employed by petitioner in accounting for the settlement of claims: "As each claim was disposed of, net payments were charged to the losses incurred account while the balance in the unpaid loss account for such claim was credited to the losses incurred account, thus clearing the unpaid loss account for that claim." Although the description of accounting for settlement of the claims (unpaid losses) which were pending as of December 31, 1962, is not a very clear statement of how petitioner accounted for such items, the result is not in dispute. Because petitioner (subsequent to December 31, 1962) settled claims pending at December 31, 1962, for amounts less than it estimated them to be on that date, petitioner understated its deduction for losses incurred in the aggregate amount of $402,314.59 between January 1, 1963, and December 31, 1975. Such understatements of the loss incurred deduction can best be understood by some examples.

Section 832(b)(5) provides for computation of the loss incurred deduction as follows:

1. Losses paid during the taxable year.
+ 2. Salvage and reinsurance recoverable at the end of preceding taxable year.
− 3. Salvage and reinsurance recoverable at the end of the taxable year.
+ 4. Unpaid losses at the end of the taxable year.
− 5. Unpaid losses at the end of the preceding taxable year (or beginning of taxable year).
= 6. Loss incurred deduction.

It is readily apparent that in all events the unpaid losses at the beginning of the taxable year will reduce the loss incurred deduction. If the unpaid losses at the beginning of any taxable year after January 1, 1963, are overestimated and such estimated loss is paid for less than the estimated amount, such overestimation will merely shift the impact of the overestimate from one taxable year to another. But an overestimate of the amount of unpaid losses as of December 31, 1962, does not merely shift the impact from one taxable year to another because the amount of unpaid losses on December 31, 1962, affects petitioner's tax liability for the first time as it was not taxable on underwriting income for prior taxable years. Because the amount of unpaid losses on December 31, 1962, reduces the loss incurred deduction for 1963 the effect of overstating that amount results in offsetting either the losses paid or the unpaid losses pending at the end of 1963 portions of the deduction to which petitioner would otherwise be entitled.

For example, assume that petitioner estimated all of its unpaid losses at $1 million on December 31, 1962, and included was a claim estimated at $500,000 which was settled in 1963 for $200,000. Assume further that during 1963 petitioner paid claims not pending on December 31, 1962, in the amount of $100,000 and on December 31, 1963, in addition to the unpaid losses which were pending on December 31, 1962, and not settled during 1963, it had unpaid losses of $800,000 which were reported to petitioner by the policyholders during 1963. When petitioner settled the $500,000 claim for $200,000, it reduced the unpaid loss account by $500,000 because the settled claim no longer represented a liability of petitioner to the policyholder. Because salvage and reinsurance recoverable are not involved, petition-

er's loss incurred deduction would be computed as follows, applying the formula set forth above:

|  |  |  |
|---|---|---|
| 1. | Losses paid in 1963 ..................................... | $300,000 |
| + 4. | Unpaid losses at 12/31/63 ($1,000,000 - $500,000 + $800,000) ................. | 1,300,000 |
|  |  | 1,600,000 |
| - 5. | Unpaid losses at 12/31/62 ........................... | 1,000,000 |
| = 6. | Loss incurred deduction ............................... | 600,000 |

If petitioner had estimated the claim in the example at the amount it was settled for ($200,000) instead of its overestimate ($500,000), line 6 above would be $900,000 as follows:

|  |  |  |
|---|---|---|
| 1. | Losses paid in 1963 ..................................... | $300,000 |
| + 4. | Unpaid losses at 12/31/63 ($700,000 - $200,000 + $800,000)..................... | 1,300,000 |
|  |  | 1,600,000 |
| - 5. | Unpaid losses at 12/31/62 ............................ | 700,000 |
| = 6. | Loss incurred deduction ............................... | 900,000 |

It is apparent, therefore, that petitioner would have been deprived of $300,000 of its loss incurred deduction.

The formula which the Code prescribes for computation of the loss incurred deduction is similar to the following formula used in the computation of cost of goods sold where inventories are utilized:

$$\begin{array}{l} \text{Beginning inventory} \\ + \text{Purchases} \\ - \text{Ending inventory} \\ = \text{Cost of goods sold} \end{array}$$

At the end of each of the taxable years involved, petitioner had the facts available to adjust that portion of its opening balance in the unpaid loss account for claims existing on December 31, 1962, which were settled during such taxable year. Because the adjustment could be made within the taxable year involved in closing the books for that year there is no violation of the concept of the annual accounting period. Such an adjustment is similar to an adjustment of an inventory. We have long held that a taxpayer is permitted to adjust inventories to conform to the facts in years before the Court. *Elm City Nursery Co. v. Commissioner*, 6 B.T.A. 89 (1927). In that case the taxpayer deliberately inflated inventory figures on its balance sheets to

present a better financial picture for borrowing funds to finance the operations of the business. The Commissioner based his determination of tax upon the inflated amounts appearing on the books of the taxpayer. We found that the taxpayer proved that the books did not correctly reflect the beginning and ending inventories and we adjusted the cost of goods sold accordingly. The Commissioner acquiesced in that decision. VI–2 C.B. 2.

In *Baumann Rubber Co. v. Commissioner*, 4 B.T.A. 671 (1926), the taxpayer adjusted its opening inventory for crude rubber it had failed to include. The Commissioner, in his statutory notice of deficiency, allowed a lesser amount to be added to the opening inventory which could be substantiated and which we upheld.

These cases demonstrate that a taxpayer's beginning inventory is not etched in concrete if an appropriate adjustment is proposed during the correct accounting period before the Court. We see no reason why the same reasoning should not be applied to the original estimate of unpaid losses of petitioner at December 31, 1962.

Respondent opposes the adjustment on several grounds. First, he argues that the unpaid loss account is not an accrual in the traditional accounting sense. We recognize that the unpaid loss entry at the end of each accounting period is nothing more than an educated guess as to petitioner's liability for claims filed during that year against insurance policies which are in force and effect on that date. We fail to see, however, why an adjustment should be precluded for that reason. Recognizing the amount to be an estimate to us seems all the more reason to permit adjustment of the amount in the annual accounting period during which transactions occur, making it apparent that the estimate is incorrect. The hindsight which respondent abhors occurs within the annual accounting period. That is not the same situation as adjusting an account in a subsequent accounting period long after ordinary business transactions demonstrate the error of the estimate.

The need to permit petitioner to adjust for the overestimation of unpaid losses as of December 31, 1962, is even more compelling in view of its being the first time that the unpaid loss account had any bearing on petitioner's tax liability. In Rev. Rul. 58–126, 1958–1 C.B. 13, which respondent vainly tries to distinguish, the Commissioner held that a savings and loan association could adjust its reserve for losses in 1957 established

prior to 1952 when it was not subject to taxation without resulting in the production of income unless it diminished the reserve below the additions to the reserve after 1951 and less chargeoffs for bad debt losses after 1951 and plus recoveries charged to the reserve after 1951. If the reserve were so diminished, gross income was held to be realized to the extent of the diminution. We hold that the same rationale should apply here and petitioner is entitled to make the adjustments which it proposes.

Respondent also relies upon *Pacific Mutual Life Insurance Co. v. Commissioner*, 48 T.C. 118 (1967), revd. on other grounds, 413 F.2d 55 (9th Cir. 1969). That case is distinguishable. The taxpayer adjusted its beginning reserves for certain categories of insurance based upon payments of some claims and upon a revaluation, using methods different from those originally used when the reserves were established. We found that the taxpayer had used "actuarial hindsight" in adjusting its beginning reserves downward. Petitioner here does not advocate such a procedure; its hindsight is strictly based upon actual settlements of the pending claims during the years it proposes adjustments. In the instant case petitioner does not rely upon "actuarial hindsight" but, instead, on "actuality hindsight." Petitioner here actually settled the claims, previously estimated, for which it seeks adjustment. The methods employed in establishing reserves for future claims to be filed against life insurance policies and those for casualty insurance policies are vastly different. In the case of life insurance the estimate is based upon averages or probabilities which are actuarily developed. By contrast, reserves for claims against casualty insurance policies which are involved here, are based upon applying the factor of settlement experience to each claim which has been actually filed.

Petitioner here proved what Pacific Mutual failed to prove; i.e., the exact liability incurred with respect to the claims included in the December 31, 1962, estimate. See *Pacific Mutual Life Insurance Co. v. Commissioner, supra,* at 130, 131. Such failure of proof by *Pacific Mutual* led us to state at page 131, "we cannot conclude that the reserves in question were either overstated or understated." In the instant case respondent raises no such question; he recognizes that the reserve on December 31, 1962, was overstated. In *Pacific Mutual* we also held that the legislative history of the applicable section (not the section

involved here) did not support the taxpayer's position. There is no legislative history for section 832(b)(5) to examine in the instant case. Moreover, there is no showing that the taxpayer relied upon Rev. Rul. 58–126, *supra,* in *Pacific Mutual.*

Although we hold for petitioner, we cannot agree with its reasons for permitting the adjustments. Petitioner attempts to characterize the overestimation of the unpaid loss account as resulting in an overstatement of income. Such characterization is erroneous. The overestimation had no bearing upon petitioner's gross income from its underwriting activities. The overestimation affected its deduction for losses incurred. After making such an erroneous characterization, petitioner argues the applicability of the tax benefit rule. We know of no case which holds that the absence of a tax benefit in the prior year gives rise to a deduction in the current year. Here, there was no tax benefit in the prior year. Cf. *Tennessee Carolina Transportation, Inc. v. Commissioner,* 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978). Indeed, we have recognized that, although we have not identified our theory as the tax benefit rule, when a casualty insurance company releases its excessive reserves, it constitutes taxable income only to the extent that the amount released consists of amounts previously deducted. *Dallas Title & Guaranty Co. v. Commissioner,* 40 B.T.A. 1022, 1031 (1939), revd. on other grounds 119 F.2d 211 (5th Cir. 1941). See also *Maryland Casualty Co. v. United States,* 251 U.S. 342 (1920). However, the taxpayer must prove what portion of the released reserve did not create a deduction in a prior taxable year. *Massachusetts Fire & Marine Insurance Co. v. Commissioner,* 16 B.T.A. 625 (1929).

Petitioner also relies upon the Commissioner's audit policy to demonstrate that the unpaid loss account as adjusted is within the percentage of tolerance that a revenue agent is to allow. This argument is unpersuasive.

2. *Recoveries of Losses Paid Prior to January 1, 1963*

Because we have held that petitioner may adjust its estimate of unpaid losses pending on December 31, 1962, it is unnecessary for us to decide its alternative position as to the treatment of recoveries on losses paid prior to January 1, 1963.

### 3. *Special Transitional Underwriting Loss*

This issue involves the appropriate point at which the special transitional underwriting loss may be utilized to reduce statutory underwriting income; i.e., is it allowable against underwriting gain before the protection against loss (PAL) deduction or allowable against statutory underwriting income after the protection against loss deduction?

Petitioner sustained underwriting losses aggregating $936,698.29 for the taxable years 1957 through 1961. Such losses may be allowed as a special transitional underwriting loss under section 821(e) for petitioner's taxable years 1965, 1966, and 1967.

Because we have adopted petitioner's position with respect to adjustments for the overestimation of unpaid losses as of December 31, 1962, we need not consider petitioner's alternative contention as to respondent's restoring to underwriting gain recoveries on claims settled prior to January 1, 1963. Petitioner's underwriting gain is, therefore, properly computed as follows:

|  | 1965 | 1966 | 1967 |
|---|---|---|---|
| Underwriting gain per statutory notice of deficiency | $102,083.01 | $60,672.28 | $287,609.39 |
| Adjustments for overestimation of unpaid losses at Dec. 31, 1962 | 23,364.18 | 21,665.51 | 16,518.47 |
|  |  |  | 271,090.92 |
| Recoveries on claims | | | [1]3,987.39 |
| Underwriting gain redetermined | 78,718.83 | 39,006.77 | 275,078.31 |

[1]This adjustment for recoveries on claims settled prior to Dec. 31, 1962, was not proposed in the statutory notice of deficiency but petitioner assumes this adjustment in all the computations in its brief; it will, therefore, be deemed a concession by petitioner.

The table on p. 956 depicts the parties' respective positions as to the appropriate point at which to allow the special transitional underwriting loss:

Section 821(e)(2) applicable to the years before the Court allows a *reduction* of statutory underwriting income for the underwriting losses of the 5 preceding taxable years not previously utilized.[3]

---

[3]SEC. 821(e)(2) REDUCTION OF STATUTORY UNDERWRITING INCOME.—For purposes of this part, the statutory underwriting income of a company described in paragraph (1) for the taxable year shall be the statutory underwriting income for the taxable year (determined without regard to this subsection) reduced by the amount by which—

(A) the sum of the underwriting losses of such company for the 5 taxable years immediately preceding January 1, 1962, exceeds

Section 823(a) provides for the determination of statutory underwriting income.[4] In summary, that section determines statutory underwriting income under sections 831 and 832, and allows a deduction under section 824(a).

Petitioner argues that section 821(e)(2) and section 824(a)(1) both allow deductions, that they are "locked in a collision course" and legislative history supports *allowance* of the special transitional underwriting loss as a *deduction* against underwriting gain. We disagree.

Section 821(e)(2) provides for a *reduction* of statutory underwriting income for the previous years' underwriting losses. Because it provides for a *reduction* of the statutory underwriting income, it is necessary to refer to section 823(a) which determines the statutory underwriting income and that section, together with sections 831 and 832, clearly allow the PAL deduction against underwriting gain in computing statutory underwriting income.

There is no ambiguity in the statutory scheme, and the legislative history does not conflict with our interpretation.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, *J.*, dissenting: The majority allow a mutual casualty insurance company to deduct the amounts by which it *overestimated* its losses (as of Dec. 31, 1962), the deductions being allowed when the actual losses were specifically determined. I would not allow these deductions, and so I respectfully dissent.

The deductions are not provided for in the statute. See *New*

---

(B) the total amount by which the company's statutory underwriting income was reduced by reason of this subsection for prior taxable years.

[4]SEC. 823. DETERMINATION OF STATUTORY UNDERWRITING INCOME OR LOSS.

(a) IN GENERAL.—For purposes of this part—

(1) The term "statutory underwriting income" means the amount by which—

(A) the gross income which would be taken into account in computing taxable income under section 832 if the taxpayer were subject to the tax imposed by section 831, reduced by the gross investment income, exceeds

(B) the sum of (i) the deductions which would be taken into account in computing taxable income if the taxpayer were subject to the tax imposed by section 831, reduced by the deductions provided in section 822(c), plus (ii) the deductions provided in subsection (c) and section 824(a).

(2) The term "statutory underwriting loss" means the excess of the amount referred to in paragraph (1)(B) over the amount referred to in paragraph (1)(A).

## SPECIAL TRANSITIONAL UNDERWRITING LOSS

|  | Petitioner's method | | | Respondent's method | | | Totals | |
|---|---|---|---|---|---|---|---|---|
|  | 1965 | 1966 | 1967 | 1965 | 1966 | 1967 | Petitioner's method | Respondent's method |
| Underwriting gain as redetermined | $78,718.83 | $39,006.77 | $275,078.31 | $78,718.83 | $39,006.77 | $275,078.31 |  |  |
| Special transitional underwriting loss | (78,718.83) | (39,006.77) | (275,078.31) | (28,873.47) | 0 | (167,289.39) | ($392,803.91) | ($196,162.86) |
| PAL deduction | (30,165.65) | (35,691.34) | (39,244.77) | (49,845.36) | (45,443.08) | (107,788.92) |  |  |
| Statutory underwriting income | (30,165.65) | (35,691.34) | (39,244.77) | 0 | (6,486.26) | 0 |  |  |
| Taxable investment income | 160,126.42 | 170,413.21 | 183,003.02 | 160,126.42 | 170,413.21 | 183,003.02 |  |  |
| Subtraction from PAL account | 30,165.65 | 35,691.34 | 39,244.77 | 49,845.36 | 45,443.08 | 107,788.92 |  |  |
| Unused loss deduction | (160,126.42) | (170,413.21) | (183,003.02) | (209,971.78) | (209,419.98) | (127,095.68) |  |  |
| Mutual Insurance Co. taxable income | 0 |  |  | 0 | 0 | 163,696.26 | (32,944.79) | 163,696.26 |
| Unused loss carryover to 1968 |  |  | 0 |  | 0 | 0 | 0 | 0 |

*Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934). The legislative history does not indicate a congressional intent to provide such deductions. The deductions are not provided for in regulations.

The statutory provision for calculation of the losses incurred deduction of mutual insurance companies had been enacted 42 years before it was first applied to mutual companies.[1] The provision initially applied to stock companies. There is no evidence that this provision was applied to stock companies with respect to December 31, 1921, estimates in the manner in which the majority now seek to apply it to mutual companies with respect to their December 31, 1962, estimates.

Would the majority require that a company which had *underestimated* its losses take into income the amount by which the losses are finally determined to exceed the original estimates? I find no authority for any such income inclusion, yet such an inclusion appears to be the necessary logical consequence to the majority's holding in the instant case.

The majority note that failure to grant the relief requested will result in petitioner never being able to compensate for its original overestimation. This same point was dismissed in *Pacific Mutual Life Insurance Co. v. Commissioner,* 48 T.C. 118 (1967), revd. on other grounds 413 F.2d 55 (9th Cir. 1969), as follows (48 T.C. at 127):

> Petitioner contends that because of special circumstances existing at the end of 1957, it overestimated the beginning 1958 reserves in question, causing a corresponding increase in its 1958 taxable income. Petitioner argues from this that if the alleged overstatements are not corrected for 1958, its income tax liability will not only be erroneous for that year but, because of the nature of the tax computation required under the 1959 Act, it will never be corrected in any later year. Assuming, *arguendo,* that the 1959 Act would have such an irreparable effect on petitioner's tax liability, petitioner's argument, as stated, is a plea for equitable relief. Such an argument cannot be considered by this Court since we lack equity jurisdiction. *Commissioner v. Gooch Co.,* 320 U.S. 418 (1943); *Lorain Avenue Clinic,* 31 T.C. 141 (1958); *Edward P. Clay,* 46 T.C. 505 (1966).

In *Pacific Mutual Life,* 48 T.C. at 129, this Court stated that the general rule is that reserves, in absence of legislative exception, may not be retroactively adjusted for purposes of correcting errors of judgment in the original estimate. Also see

---

[1]Sec. 246(a)(6), Revenue Act of 1921, Pub. L. 67–98.

*Rio Grande Building & Loan Association v. Commissioner*, 36 T.C. 657, 664 (1961). This rule should be applied to the instant case since there is no indication of congressional intent to the contrary.

The majority distinguish *Pacific Mutual* as involving "actuarial hindsight" whereas the instant case involves "actuality hindsight." But in *Pacific Mutual* this Court stated:

Thus, even if we were of the view that Congress had expressed an intent to permit retroactive adjustment to beginning 1958 reserves, *which we are not*, we would still be required to hold against petitioner for failure to prove any overstatement in such reserves. [48 T.C. at 131. Emphasis supplied.]

Thus, in *Pacific Mutual* we did not say that if petitioner could prove the overstatement by actual experience, then it would be able to make retroactive adjustment. A necessary prerequisite is congressional intent to permit retroactive adjustment. The majority in the instant case admit they cannot find such an intent.[2]

It is not at all clear what would have been done if the Congress had focused on this question when the statute was extended to apply to mutual insurance companies. On the one hand, the equities presented in the majority's opinion would have argued for allowing the deduction. On the other hand, the Congress would have had to make a conscious decision to provide either (1) a "one-way-street" or (2) an inclusion of income for those companies that had underestimated their losses as of December 31, 1962. The Congress also would have had to

---

[2]The majority point to respondent's published position in a 1958 ruling. That ruling has been explained (Rev. Rul. 73–273, 1973–1 C.B. 79) as follows:

"Rev. Rul. 58–126, 1958–1 C.B. 13, holds that a transfer in 1957 by a savings and loan association to its undivided profits of an amount from its reserve for losses that was set up from undivided profits during years prior to 1952, when such association was not subject to Federal income tax, did not result in gross income for Federal income tax purposes in the year of transfer. *Similarly,* in the instant case, the *valuation reserve accumulated in years prior to the taxpayer's becoming subject to Federal income tax also* represents undivided profits (accumulated earnings and profits) during years when it was not subject to Federal income tax and *is not relevant in determining gross income or deductions of any year during which the taxpayer is subject to such tax.* [Emphasis supplied.]"

Although the approach of the 1958 ruling may have been appropriate in the savings and loan association bad debt reserve area, it does not seem to be appropriate to extend that possible executive largesse.

The majority concede that, under sec. 832(b)(5), the amount of the unpaid losses at the end of 1962 are indeed relevant in determining the loss incurred deduction for any year the petitioner is subject to tax. The real issue in the instant case is whether that admittedly relevant loss reserve can be retroactively adjusted and in the face of our statements in *Pacific Mutual Life Insurance Co. v. Commissioner*, 48 T.C. 118 (1967), the answer must be no.

recognize that the law would be more complicated, if it provided for these adjusting deductions and inclusions, than it would be under a "quick-and-dirty" approach. Since it is by no means clear to me that the Congress would have chosen to fine-tune the statute by requiring adjustments in all cases or by requiring only those adjustments that result in a lesser tax, I cannot with confidence say how the Congress would have acted. I would prefer to apply the statute as the Congress enacted it.

For the foregoing reasons, I would not allow the deductions sought in this case.