STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 26511-82, 34747-84.      Filed April 27, 1987.

*Harry D. Shapiro, Robert G. Nath,* and *Francis X. Pugh,* for the petitioner.

*Lawrence D. Garr,* for the respondent.

SWIFT, *Judge*: Petitioner State of Maryland Deposit Insurance Fund Corp. (MDIFC) is the successor corporation to Maryland Savings-Share Insurance Corp. (MSSIC). MDIFC is a nonstock, nonprofit corporation organized on May 18, 1985, by the State of Maryland to provide insurance to savings and loan associations chartered within the State. In early 1985, several savings and loan associations insured by MSSIC defaulted on their obligations. This created a crisis within the savings and loan community in Maryland. MSSIC was merged into MDIFC, and all of the assets, liabilities, rights, powers, obligations, and functions of MSSIC were transferred to MDIFC.

In statutory notices of deficiency dated September 29, 1982, and July 11, 1984, respondent determined deficiencies in MSSIC's Federal income tax liabilities for 1974 through 1979, 1981, and 1982, as follows:

| Year | Deficiency |
|------|-----------|
| 1974 | $323,775 |
| 1975 | 433,125 |
| 1976 | 613,507 |
| 1977 | 303,222 |
| 1978 | 760,222 |
| 1979 | 978,803 |
| 1981 | 1,563,590 |
| 1982 | 2,390,238 |

Due to concessions, the one remaining issue is whether MSSIC properly computed its insurance-related losses under section 832(b)(5)(B).[1]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

Depending primarily on the financial qualifications of a savings and loan association, savings account deposits made with a savings and loan association may be insured by the Federal Savings & Loan Insurance Corp. (FSLIC), by State insurance funds, or (in States that have authorized them) by private insurance funds. MSSIC was an insurance fund established by the State of Maryland in 1962 for the purpose of insuring savings account deposits with savings and loan associations doing business in Maryland that did not qualify for FSLIC insurance. MSSIC was established as a result of certain savings and loan scandals that occurred in Maryland in the late 1950's, and its organization in 1962 reflected the conclusion of the Maryland public officials that a private insurance fund in Maryland was necessary to protect savings account deposits made with savings and loan associations not insured by FSLIC.

MSSIC was a nonstock, nonprofit corporation, supervised by a board of directors, eight of whom were elected by member savings and loan associations and three of whom were appointed by the Governor of Maryland. The State of Maryland did not pledge its faith and credit in support of the insurance obligations of MSSIC, and MSSIC therefore was a private insurance fund offering insurance to those savings and loan associations doing business in Maryland who could not (or who chose not to) qualify for FSLIC insurance.

Under Maryland law, MSSIC was exempt from all State and local taxes. Over the years, MSSIC sought to obtain a legislative or judicial determination that it also was exempt from Federal income taxation under section 501(c)(14)(B), but those efforts were unsuccessful. See *United States v. Maryland Savings-Share Ins. Corp.*, 400 U.S. 4 (1970).

MSSIC's bylaws and rules and regulations provided that to become a member of MSSIC (and thereby to obtain from MSSIC insurance protection for its customers' savings account deposits), a federally or State-chartered savings and loan association was required to maintain its principal office in Maryland and to have its finances and management practices reviewed by MSSIC's membership committee. Each savings and loan association that was a member of MSSIC

was required to contribute to MSSIC (and thereafter to maintain with MSSIC) a capital deposit equal to 2 percent of all savings account deposits made by its customers. A member could withdraw its membership in MSSIC upon 12 months' notice, in which case its capital deposit with MSSIC would be returned.

The number of savings and loan associations that were members of MSSIC, the total customer savings account deposits that were made with MSSIC-affiliated savings and loan associations, and the total capital deposits received by MSSIC from its member associations at the end of each of the years 1974 through 1982 are set forth below:

| Year | Number of members | Total deposits in savings accounts | Total member capital deposits with MSSIC |
|---|---|---|---|
| 1974 | 150 | $854,463,365.95 | $17,089,267.32 |
| 1975 | 140 | 1,084,711,373.82 | 21,694,227.48 |
| 1976 | 135 | 1,287,000,000.00 | 25,740,000.00 |
| 1977 | 136 | 1,537,554,776.00 | 30,751,095.52 |
| 1978 | 135 | 1,696,182,292.00 | 33,923,645.84 |
| 1979 | 132 | 1,733,138,674.00 | 34,662,773.48 |
| 1980 | 121 | 2,034,416,673.00 | 40,688,333.46 |
| 1981 | 105 | 2,454,911,863.00 | 49,098,237.26 |
| 1982 | 102 | 3,507,531,885.00 | 70,150,637.70 |

MSSIC provided two basic services to its members and their customers. First, MSSIC monitored the operations and finances of member savings and loan associations. Second, MSSIC insured deposits made by customers into savings accounts at member savings and loan associations in an amount not to exceed $10,000 per account more than the insurance coverage available from FSLIC on savings account deposits made with FSLIC-insured savings and loan associations.

To assist in monitoring the finances and operations of its members, MSSIC required member associations to submit periodic financial reports for MSSIC's review. Members with assets of $3 million or more submitted monthly financial reports. Members with assets of less than $3 million submitted quarterly financial reports. Member associations with assets exceeding $5 million were to be audited annually by certified public accountants and were to furnish a copy of the certified audit reports to MSSIC. An on-site examination of the operations of each member association

was conducted by MSSIC approximately once every 12 months.

To assist MSSIC in maintaining the financial integrity of member associations, certain requirements were set forth in MSSIC's bylaws and rules and regulations that were to be adhered to. Each member savings and loan association was required to maintain a minimum net worth. Until 1980, the minimum net worth of member associations was fixed at 6 percent of the aggregate withdrawal value of total customer savings account deposits with member associations. The percentage was adjusted to 4.0 percent in 1980, 4.13 percent in 1981, and 4.26 percent in 1982. Each member association also was required to maintain a liquidity fund which, after certain adjustments, was to equal at least 6 percent of the total amount of its customers' savings account deposits.

Remedial measures were available to MSSIC to assist member associations experiencing financial or operational problems. For example, MSSIC could direct member associations to reduce expenses or to establish reserve funds to protect against potential losses. If a member association failed to comply with a directive from MSSIC, MSSIC could direct the association to cease and desist actions that MSSIC believed to be unsound and unsafe. If the association did not comply, MSSIC could remove the directors and officers of the association and could itself assume control of the operations of the association.

Within the scope of its insurance function, MSSIC provided three types of insurance-related protection, namely, advances, financial assistance agreements, and payments upon the occurrence of an event of default. An advance by MSSIC could be made to a member association in financial difficulty in the form of a loan, a purchase of a member association's assets, or a capital contribution by MSSIC. Advances could be made to prevent a member's default, to preserve a member's financial integrity, or to financially revive a member association that had defaulted on obligations to its depositors.[2]

---

[2]With regard to advances, sec. 2-707 of MSSIC's bylaws provided, in relevant part, as follows:

Section 2-707. *Advances.* In order (1) to prevent a default or preserve the financial integrity of a member, or (2) to restore a member in default to normal operations as an insured member, or (3) to preserve the financial integrity of an association to which there have been transferred

MSSIC also could enter into financial assistance agreements with or on behalf of member associations in order to avert defaults by member associations. A financial assistance agreement, like an advance, was discretionary with MSSIC unless the total net worth of a member association dropped below 3.0 percent of the aggregate withdrawal value of all customer savings account deposit balances at the member association. In that event, MSSIC was required to enter into a financial assistance agreement to aid the member association.[3]

The third type of insurance-related coverage provided by MSSIC took the form of cash payments to individuals and entities who had made savings account deposits with member associations. Such payments were triggered by an "event of default" as described in MSSIC's bylaws. Section 2-703 of those bylaws provided as follows:

> Section 2-703. *Events of Default.* No payment shall be made by the Corporation with respect to its insurance liability, except as otherwise provided, unless an event of default shall have occurred with respect to any member, as defined by these By-Laws, * * * . As used in these By-Laws, and in the Rules and Regulations of the Corporation, the term "event of default" shall mean for any member (A) its adjudication in bankruptcy in accordance with any applicable law of the United States of America, (B) the appointment of a conservator for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled, or (C) the appointment of a receiver for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled.

From the creation of MSSIC in 1962 until December of 1984, MSSIC made insurance-related payments to only two

---

free share accounts * * *, the Corporation is authorized, in its discretion, to make loans to any such member with or without security. * * * The Corporation may buy any asset owned by any such member at the book value thereof or at such other value as the Board of Directors may determine, * * *. The Corporation may make capital contributions to any such member but no such capital contributions shall be made to any such member in an amount in excess of that which the Corporation finds to be reasonably necessary to save the expense of liquidating an institution in default or to pay the net loss of any account transferred to such association * * *

[3]Sec. 2-708 of MSSIC's bylaws addressed MSSIC's authority to enter into financial assistance agreements as follows:

Section 2-708. *Agreements.* The Corporation may enter into written agreements with its members and others for the purpose of averting an event of default. Pursuant to any such agreement, it may lend money to, guarantee, endorse, or act as surety on the bonds, notes, contracts or other obligations of, or otherwise financially assist any member association.

of its member associations. In 1963, an event of default occurred at one member savings and loan association and resulted in a payment by MSSIC of $300,000 to the customers of the savings and loan association as a return of their account balances.

During the years 1980 and 1981, MSSIC made financial assistance payments totaling $2,884,448 to a member association. The payments were made to Security Savings & Loan Association (Security Savings) as a result of financial problems incurred by that association. The parties have stipulated that as a result of poor loan underwriting and bad management, Security Savings had financial problems of a type that could have resulted in MSSIC's providing financial assistance to Security Savings prior to 1980. Not until 1980, however, did MSSIC enter into an agreement dated March 17, 1980, with Security Savings and Sharon Savings & Loan Association (Sharon Savings), under which MSSIC was required to provide financial assistance to Security Savings or its successor and under which Security Savings was merged with and acquired by a subsidiary of Sharon Savings.

In 1985, two member savings and loan associations experienced events of default in that a conservator was appointed to manage the affairs of the associations. One of these savings and loan associations had experienced liquidity problems as early as 1979. In October of 1985, after the trial of this case and after the merger of MSSIC into MDIFC, MDIFC, as conservator of one of these associations (namely, Merritt Commercial Savings & Loan Association (Merritt)), entered into an agreement with Chase Manhattan Corp. (Chase) whereby MDIFC contributed $25 million to Merritt as a condition of Chase's acquisition of Merritt. The record does not indicate the manner in which MDIFC provided financial assistance, if any, to the other savings and loan association that was taken over by a conservator in 1985.

MSSIC timely filed U.S. Corporate Income Tax Returns for 1974 through 1982. The returns were filed based on the accrual method of accounting. On those returns, MSSIC deducted an estimate or a reserve for insurance-related losses. MSSIC calculated those deductions using a formula derived by Dr. Joseph White, an economist and consultant

to financial institutions. The deductions were calculated in the following manner: (1) For each year, the average total customer savings account deposit balances for all of its member associations was determined; (2) from that amount, MSSIC subtracted the yearend balance of all member capital deposits, the average aggregate net worth of all of its member associations at the end of the year, and 1 percent of the average aggregate customer savings account deposit balances of all of its member associations; (3) MSSIC then divided the remainder obtained from steps one and two by the number of member associations at the end of each year. The quotient obtained each year by the third step of the computation represented the amount MSSIC claimed on its tax returns as insurance-related losses.

In his notices of deficiency, respondent disallowed MSSIC's deductions for the insurance-related losses. Respondent, however, allowed MSSIC to deduct as ordinary and necessary business expenses MSSIC's insurance-related payments to Security Savings in 1980 and 1981 totaling $2,884,448. MSSIC's additions to its reserve for insurance-related losses and the deductions disallowed by respondent are set forth below:

| Year | Addition to insurance reserve | Net amount disallowed by respondent |
|------|------|------|
| 1974 | $806,931 | $806,931 |
| 1975 | 1,095,310 | 1,095,310 |
| 1976 | 688,691 | 688,691 |
| 1977 | 1,885,795 | 1,885,795 |
| 1978 | 2,426,915 | 2,426,915 |
| 1979 | 1,799,117 | 1,799,117 |
| 1980 | 5,982,857 | 3,278,739 |
| 1981 | 6,577,881 | 6,397,551 |
| 1982 | 8,790,371 | 8,790,371 |

OPINION

On brief, respondent concedes that MSSIC is an insurance company for Federal income tax purposes and that as an insurance company, MSSIC is entitled under section 832 to a deduction in each of the years in issue for "incurred but not reported" (IBNR) insurance losses. MSSIC clearly incurred insurance-related losses in two of the years in dispute, and

respondent has allowed MSSIC ordinary loss deductions for those known losses (namely, the $2,884,448 paid to Security Savings in 1980 and 1981). The deductibility of the amounts disallowed turns on whether they represent, at the end of each year, "losses incurred" under section 832(b)(5).

This same question (involving a loss deduction claimed by MSSIC on its 1971 Federal income tax return) was previously litigated by MSSIC in the U.S. Court of Claims and was decided adversely to MSSIC. See *Maryland Savings-Share Ins. Corp. v. United States*, 226 Ct. Cl. 487, 499-508, 644 F.2d 16, 23-29 (1981). By the time of the trial of that case, MSSIC had not incurred any insurance-related losses other than a minor loss in 1963. Petitioner argues that the Court of Claims' decision is distinguishable herein because of the insurance-related losses MSSIC incurred in 1980 and 1981, because of the disastrous insurance-related losses MSSIC and MDIFC incurred in 1985, and also because of additional expert witness testimony in evidence in this case.

Insurance companies (other than life insurance companies) are taxable either under sections 821 through 826 or under sections 831 and 832. The provisions that apply depend on the nature of the particular insurance company and on the nature or the type of insurance under consideration.

Sections 821 through 826 govern the taxability of mutual insurance companies, and sections 831 and 832 govern the taxability of stock-owned insurance companies, as well as mixed insurance companies that possess some of the attributes of both stock and mutual insurance companies. Sec. 1.821-1(a), Income Tax Regs.; *National Chiropractic Ins. Co. v. United States*, 365 F. Supp. 971, 973 (S.D. Iowa 1973), affd. 494 F.2d 332 (8th Cir. 1974). See generally K. Tucker, Federal Taxation of Insurance Companies, par. 10.03 (1986). Regardless of whether MSSIC is to be regarded as a mutual insurance company or as a nonmutual insurance company, the deduction for losses incurred by both types of insurance companies is governed by section 832. See sec. 823(a)(1)(B).

Insurance-related loss deductions allowed to insurance companies under section 832 are described more specifically in section 832(b)(5) to include "losses paid" and certain "unpaid losses." Section 832(b)(5) provides as follows:

(5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

   (A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

   (B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

In a determination under section 832(b)(5)(B) of an insurance company's unpaid losses at the end of each year, the regulations under section 832 recognize that the computation used by an insurance company to compute its unpaid losses may represent merely an estimate. But the regulations emphasize that the estimate must be targeted to actual losses incurred. Section 1.832-4(a)(5) and (b), Income Tax Regs., provides as follows:

   (5) In computing "losses incurred" the determination of unpaid losses at the close of each year must represent *actual unpaid losses* as nearly as it is possible to ascertain them.

   (b) Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises *only actual unpaid losses* stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of such losses which, in the opinion of the district director are in excess of the actual liability determined as provided in the preceding sentence will be disallowed as a deduction. The district director may require any such insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred." [Emphasis added.]

The validity of these regulations (and the requirement that IBNR loss deductions be limited to estimates of actually incurred losses) has been upheld by the courts. *Hanover Ins. Co. v. Commissioner*, 598 F.2d 1211, 1219-1221 (1st Cir. 1979), affg. 69 T.C. 260 (1977); *Hanover Insurance Co. v. Commissioner*, 65 T.C. 715 (1976).

   In its interpretation of the above statutory and regulatory provisions, respondent has allowed an insurance company to deduct estimates of losses actually incurred by

yearend but not yet reported to the insurance company. Rev. Rul. 70-643, 1970-2 C.B. 141. Respondent herein does not disavow the availability to MSSIC of deductions for IBNR losses. Rather, respondent argues that all losses actually incurred by MSSIC in each of the years in issue have been allowed and that the deductions in question represent not IBNR losses but rather estimates of potential future losses (i.e., contingency reserves). For the reasons set forth below, we agree with respondent.

Clearly, estimates are permissible in calculating IBNR insurance losses. By definition, an insurance company will not yet know the specific amount of such losses at the end of the taxable year (because they have not yet been reported). The authorities are clear, however, that the calculation of IBNR losses must be based on estimates of actually incurred losses as of the end of the year. This is to be distinguished from an impermissible calculation based on estimates of potential losses that might be incurred in future years. *Maryland Savings-Share Ins. Corp. v. United States*, 226 Ct. Cl. at 499-500, 507, 644 F.2d at 24, 28; *Home Mutual Insurance Co. v. Commissioner*, 70 T.C. 944, 951 (1978), affg. in part, revd. in part and remanded in part 639 F.2d 333 (7th Cir. 1980); *Modern Home Life Insurance Co. v. Commissioner*, 54 T.C. 935, 939 (1970).[4]

Throughout the years in issue (and apparently in subsequent years as well), all of MSSIC's insurance-related losses were reported and allowed in the years the losses were incurred (i.e., in the years the agreements giving rise to the obligations were entered into or in the years payments with respect thereto were made). The evidence before us simply does not establish that MSSIC had any incurred but not yet reported losses as of the end of any of the years in issue. That being the case, any calculation of IBNR losses made by MSSIC during the years in issue likely would not be acceptable under section 1.832-4(b), Income Tax Regs., because such a calculation would not be based on estimates of actual but not yet reported losses.

When MSSIC's proposed calculation of its IBNR losses is examined, it is clear that it is not based on any loss experience data of MSSIC, but on the loss exposure of MSSIC

---

[4] See also Rev. Rul. 61-167, 1961-2 C.B. 130.

vis-a-vis its future potential losses. That is, MSSIC's calculation of its IBNR losses is based on the net worth of the savings and loan associations insured and on the dollar amount of total deposits in the customer savings accounts at member savings and loan associations.

As did the First Circuit in *Hanover Insurance Co. v. Commissioner*, 598 F.2d at 1221, in analyzing the claimed IBNR losses before it, we conclude that a comparison of the amount of insurance-related loss deductions MSSIC has been allowed during the years in issue with MSSIC's actual loss experience during those years demonstrates that MSSIC already has received a deduction for 100 percent of its incurred losses.

We are fully cognizant of the disastrous insurance-related losses MSSIC and MDIFC incurred in 1985. The Federal income tax laws, however, do not allow an insurance company (other than a life insurer) to build up a contingent loss reserve over a period of years in anticipation of such future losses.

We do not accept petitioner's argument that the losses it paid in 1985 in fact were incurred in earlier years, but merely were reported for the first time in 1985. Certainly there were many acts and events that led up to the defaults by the two savings and loan associations in 1985. Petitioner is perhaps correct in arguing that in all probability many of the acts and events giving rise to the defaults occurred over many years. Acts such as mismanagement, issuance of bad loans, and embezzlement, however, do not constitute events of default under MSSIC's bylaws, nor do they necessarily result in actual insurance-related losses for MSSIC.

Each member savings and loan association has its own liquidity fund to protect it from financial losses that might arise from bad loans, from losses caused by mismanagement, and from possible embezzlement of its employees. Such acts (assuming they occurred at some of the savings and loan associations that were members of MSSIC during the years in issue) would not support loss deductions with respect thereto by MSSIC unless and until they constituted an event of default under MSSIC's bylaws, until they resulted in an insurance-related payment by MSSIC, or until they gave rise to an obligation to make such a payment. As

we stated in *Modern Home Life Insurance Co. v. Commissioner, supra* at 939—

a deduction [for IBNR losses] will [only] be allowed for a loss resulting from the occurrence of an event which fixed liability prior to the close of the taxable year * * *

The Court of Claims answered MSSIC's argument along this same line as follows:

[MSSIC's expert witness'] testimony was presumably designed to show that when losses occur to the insurer they do not spring up full grown but are seeded by events typically occurring 10 years earlier. But such testimony, even if it were more precise and its supporting date available for evaluation, would not show that bad or improvident loans, or other actions of bad, imcompetent or dishonest management represent present losses to the insurer which will necessarily or even probably result in the reporting of loss 10 years later. * * * Moreover, since savings and loan associations are required to accumulate their own reserves to protect them against loss, they may suffer unwise, negligent or dishonest acts by their officers, employees or others without becoming insolvent and defaulting in their obligations to their depositors. [*Maryland Savings-Share Ins. Corp. v. United States*, 226 Ct. Cl. at 506, 644 F.2d at 27; fn. refs. omitted.]

Lastly, petitioner argues that its calculation of IBNR losses should be accepted because the amount thereof is in line with actual insurance-related losses experienced by FSLIC. Again we reiterate our sympathy with MSSIC and MDIFC, and with the losses they have incurred in recent years. The short answer, however, to petitioner's argument is that the calculation of IBNR losses must be based on the actual loss experience of the particular taxpayer, particularly where the evidence is so clear that the taxpayer did not incur any unreported actual losses during the years in question.

*Decision will be entered under Rule 155.*